Sundar V. NILAVAR, Plaintiff,

v.

MERCY HEALTH SYSTEM–
WESTERN OHIO, et al.,
Defendants.

No. 3:99CV612.

United States District Court,
S.D. Ohio,
Western Division.

July 5, 2005.

Kenneth A. Lazarus, Maggi Ann Lazarus, Kenneth A. Lazarus & Assoc, Washington, DC, Lee Charles Falke, Lee C. Falke & Associates, Dayton, OH, for Plaintiff.

Scott D. Phillips, Frost Brown Todd LLC, Cincinnati, OH, for Defendants.

DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 117) AND OVERRULING PLAINTIFF'S ALTERNATIVE CROSS–MOTION PURSUANT TO RULE 56(f) IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 125); PLAINTIFF TO ADVISE COURT AS TO STATUS OF STATE CLAIMS SET FORTH IN NINTH CAUSE OF ACTION; FINAL JUDGMENT IS NOT TO ENTER

RICE, District Judge.

Plaintiff Sundar V. Nilavar, M.D., is a radiologist who for years was employed by Springfield Radiology, Inc. ("SRI"). Up until 1995, SRI physicians provided diagnostic radiology services to three hospitals in the Springfield and Urbana areas, in

Ohio, two of which are owned by Defendant Mercy Health Systems–Western Ohio ("MHS–WO" or "Mercy"). As of 1991, SRI was comprised of eleven principals.[1] In 1993, SRI engaged in extensive negotiations with MHS–WO toward an exclusive contract for the provision of radiological services at the Mercy Hospitals and several other Mercy long-term care facilities. Several years of negotiations yielded no agreement.

In March of 1995, MHS–WO concluded negotiations with SRI and prepared a Request for Proposal ("RFP"), wherein it invited different radiologists and radiology groups to tender proposals to be its exclusive provider of such services. Accordingly, the physician-shareholders of SRI (including Plaintiff) decided that in December of 1995, the Mercy group would present a proposal to MHS–WO in response to the RFP. Without informing Plaintiff, Dr. Robin E. Osborn, a physician-shareholder of SRI, formed his own radiology group, Diagnostic Imaging Associates of Ohio, Inc. ("DIA"), and submitted a proposal to MHS–WO on its behalf. DIA included only three physicians from SRI's Mercy group; Dr. Nilavar was not included in this new entity. In August of 1995, MHS–WO accepted DIA's proposal. An exclusive Radiology Services Agreement was signed on December 4, 1995, effective January 1, 1996. On December 20, 1995, MHS–WO notified Plaintiff that his clinical privileges would be terminated, effective January 1, 1996. Dr. Nilavar requested that Mercy grant him a hearing, which was denied.

In 1996, Plaintiff filed suit in the Clark County Court of Common Pleas against Dr. Osborn and DIA, alleging breach of contract, estoppel, breach of fiduciary duty and fraud arising out of Dr. Osborn's failure to negotiate the exclusive contract on his behalf. Plaintiff states that the case was tried to a jury in June of 1999, and that he received a judgment in the amount of $100,000. On April 7, 2000, the Second District Court of Appeals issued its ruling on the cross-appeals. That court upheld the jury's verdict in favor of Nilavar on the breach of contract claim and, due to the trial court's error in overruling Nilavar's motion to compel production of financial records from Dr. Osborn and DIA, it ordered a new trial on the issue of damages. *Nilavar v. Osborn*, 137 Ohio App.3d 469, 738 N.E.2d 1271 (2000).[2]

On November 19, 1999, Plaintiff initiated the present litigation against MHS–WO; Catholic Healthcare Partners ("CHP"), MHS–WO's parent company; Michael J. Peterson ("Peterson"), the former Regional President and Chief Executive Officer of MHS–WO; and Jerrold A. Maki ("Maki"), Mr. Peterson's successor as Regional President and CEO of MHS–WO.[3] In his Verified Complaint (Doc. # 1), Plaintiff asserted eight causes of action, to wit: (1) contract in restraint of trade, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1; (2) tying arrangement in restraint of trade, in violation of § 1 of the Sherman Act; (3) contract and tying arrangement in restraint of trade, in violation of Ohio's Valentine Act, Chapter 1331 of the Ohio Revised Code; (4) a state law claim of tortious interference with a business relationship; (5) a state law claim of

---

1. Five SRI radiologists practiced almost exclusively at Springfield Community Hospital ("Springfield group"), and the other six radiologists practiced almost exclusively at the Mercy Hospitals ("Mercy group").

2. The parties to that lawsuit settled it upon remand.

3. Plaintiff also set forth claims against Dr. Osborn and DIA, which have been resolved. *See* Doc. # 71.

breach of implied covenant of good faith and fair dealing; (6) a state law claim of civil conspiracy; (7) a state law claim of denial of right to due process; and (8) a state law claim of breach of contract. In his Amendment to his Complaint (Doc. # 178), Plaintiff has set forth a ninth cause of action, a state law claim for intentional infliction of emotional distress.

In a decision entered on December 19, 2000, the Court dismissed the following claims: 1) Plaintiff's federal and state antitrust claims of an illegal tying agreement (Count Two and a portion of Count Three); 2) state law claim for breach of implied covenant of good faith and fair dealing (Count Five); 3) state law conspiracy claims (Count Six) as brought against Maki and Peterson, in their entirety; and 4) state law conspiracy claim (Count Six) against MHS–WO and CHP, as based on the breach of implied covenant of good faith and fair dealing, federal and state antitrust claims, and violation of 26 U.S.C. § 501(c)(3). *Nilavar v. Mercy Health System–Western Ohio,* 142 F.Supp.2d 859 (S.D.Ohio 2000). Further, on December 13, 2001, the Court entered a stipulated dismissal of all remaining claims against Dr. Osborn and DIA (Doc. # 71).

Currently before the Court is Defendants MHS–WO, CHP, Peterson and Maki's ("Defendants") Motion for Summary Judgment (Doc. # 117). Therein, Defendants assert that summary judgment is proper with respect to all remaining claims set forth in Plaintiff's Complaint (Doc. # 1). However, they have not requested summary judgment on Plaintiff's ninth claim, a claim of intentional infliction of emotional distress, since that claim was added after the Defendants had filed their motion seeking summary judgment. For the reasons explained below, the Court agrees, and Defendants' motion for summary judgment is sustained.

I. *Standards Governing Motions for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for

summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor

of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ..."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## II. *Analysis*

With the exception of Plaintiff's ninth claim, which was added after they had filed their motion, Defendants move for summary judgment as to each of Plaintiff's remaining claims. Each will be addressed in turn.

### A. Sherman Act (Count One)

Plaintiff alleges that Defendants' exclusive contract for radiology services with DIA is a contract in restraint of trade, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Defendants assert that four different bases exist on which this Court should grant summary judgment: *first*, that Plaintiff's claims fail to identify properly a product or geographic market; *second*, that Plaintiff cannot establish antitrust injury; *third*, that the evidence fails to raise a genuine issue of material fact on the question of proximate cause; and *fourth*, that the limited term of the exclusive contract between Mercy and DIA preserved competition.[4] As a means of analysis, the Court will address those arguments in the above order.

### 1. *Failure to Identify Proper Product and Geographic Market*

■■■ As the Court has noted previously, this matter is governed by the rule of reason. *See Nilavar v. Mercy Health System–Western Ohio*, 142 F.Supp.2d 859 at 873 (S.D.Ohio 2000). As opposed to the per se analysis of alleged antitrust violations, which identifies certain practices that "are entirely void of redeeming competitive rationales," a rule of reason analysis requires a court to analyze the history of the restraint and the restraint's effect on competition. *National Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir.2003), *citing Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1016 (10th Cir.1998).

In analyzing agreements that are not per se violations of the antitrust laws, courts look to whether the action complained of "has the potential for genuine adverse effects on competition," which entails an inquiry into market definition and market power. *Lie v. St. Joseph Hosp. of Mount Clemens, Mich.*, 964 F.2d 567, 569 (6th Cir.1992), *citing FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). "The purpose of this 'rule of reason' analysis is to discover whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Id.* (internal quotations omitted). Under this analysis, an antitrust plaintiff must establish that the restraint produces significant anticompetitive effects within relevant product and geographic markets. *National Hockey League Players' Ass'n*, 325 F.3d at 718, *citing Tanaka v. Univ. of Southern Cal.*, 252 F.3d 1059, 1063 (9th Cir.2001).

■ The relevant product market is a product or service, or the smallest group of products or services, for which a hypothetical monopolist could profitably charge more than the competitive price for a significant period of time. Herein, Plaintiff defines this market as "the physician component of diagnostic radiology services provided in [a] . . . hospital setting" with a relevant submarket consisting of "the physician component of diagnostic radiology services provided to inpatients" (Doc. # 126 at 41).[5] The relevant geographic

---

4. Defendants raise two other arguments in support of their request for summary judgment on this claim, to wit: that Mercy's Request For Proposal process was the result of, rather than a restraint of, competition; and that Plaintiff was incapable of competing. Since the first of those is merely a restatement of their request for summary judgment on the basis no antitrust injury, while the second restates their argument concerning causation, the Court does not address them separately.

5. Plaintiff specifically excludes from this definition non-hospital-based radiological services, such as those provided at stand-alone clinics or imaging centers. *See* Doc. # 144 at 6.

market in an antitrust action is the locale in which consumers of a product or service can turn for alternate sources of supply. Plaintiff defines this market as "essentially comprising Clark and Champaign Counties" (*Id.* at 42).[6]

The Court understands Defendants to offer two arguments with respect to Plaintiff's proposed market definitions, to wit: *first*, that the definitions themselves are foreclosed as a matter of law, and *second*, that Plaintiff has not offered sufficient evidence to support the validity of his market definitions. Each will be addressed in turn.

a. *Legal Propriety of Plaintiff's Proposed Market*

█ In the Sixth Circuit, defining the particular product and geographic market in an antitrust case is a question of fact, as opposed to a question of law. *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir.2004). *See also White and White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 499–500 (6th Cir.1983) (A district court's determination of the market tests used to define the market is a question of law, reviewable by an appellate court on a *de novo* basis, but the conclusion that the relevant markets are defined by particular products bought and sold in a particular geographic location is a question of fact, and is subject to the "clearly erroneous" standard of review.). Nonetheless, Defendants argue that Plaintiff's market definitions must be rejected as a matter of law. Specifically, they argue that "[w]hen a

physician challenges a hospital's use of an exclusive contract, the relevant market is the area in which physicians compete for jobs" (Doc. # 117 at 44). For this proposition, Defendants rely heavily on the Supreme Court's decision in *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) and on this Court's decision in *Reddy v. Good Samaritan Hosp. and Health Center*, 137 F.Supp.2d 948 (S.D.Ohio 2000).[7]

In *Jefferson Parish*, the Supreme Court reviewed an action brought by an anesthesiologist under § 1 of the Sherman Act, challenging an exclusive contract entered into between a hospital and a firm of anesthesiologists. After holding that the formation of the exclusive contract did not constitute a per se violation of the Sherman Act, the Court analyzed arguments regarding the contract's actual effect on competition. As a preface to that discussion, the Court noted that "[t]he market is not necessarily the same as the market in which hospitals compete in offering services to patients; it may encompass competition among anesthesiologists for exclusive contracts ... and might be statewide or merely local." 466 U.S. at 29, 104 S.Ct. 1551 (footnote omitted). Despite that, the Court did not hold, as a matter of law, that the market in such an action is the one in which anesthesiologists compete for exclusive contracts. It did doubt that patients are "sophisticated enough to know the difference between two anesthesiologists," *id.* at 30, 104 S.Ct. 1551, but it

---

6. As described in a previous entry regarding Dr. Pisarkiewicz's proposed expert testimony (Doc. # 193), the specific definition of the geographic market ultimately arrived at by Plaintiff is an area within those counties consisting of 19 ZIP codes. *See* Affidavit of John Pisarkiewicz, Ph.D., Doc. # 125 Ex. Q ("Pisarkiewicz Affidavit").

7. Defendants also cite substantial non-binding authority for this proposition, including *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994); *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 478 (7th Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *Dos Santos v. Columbus–Cuneo–Cabrini Med. Ctr.*, 684 F.2d 1346, 1354 (7th Cir.1982).

noted that such a determination rests on an empirical account of the effect of an arrangement on price or quality. *Id.* at 30 n. 49, 104 S.Ct. 1551. Even though the Court found that the plaintiff had failed to make a sufficient evidentiary showing, it explicitly allowed for the possibility that the exclusive requirements contract between the hospital and the anesthesiology firm "*could [have] be[en] unlawful* if it foreclosed so much of the market from penetration by [the anesthesiology firm's] competitors as to unreasonably restrain competition in the affected market, the market for anesthesiological services." *Id.* at 30 n. 51, 104 S.Ct. 1551 (emphasis added), *citing Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) and *Standard Oil Co. v. United States,* 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). In sum, although the Supreme Court, engaging in a rule of reason analysis, did reject the plaintiff's market claims, it did so because of those claims' factual and not their legal deficiencies. Accordingly, Defendants' reliance on *Jefferson Parish* for the proposition that Plaintiff's market definitions are incorrect as a matter of law is misplaced.

Defendants similarly misinterpret this Court's decision in *Reddy,* which was highly similar, both factually and legally, to *Jefferson Parish.*[8] Therein, the plaintiff was an anesthesiologist who challenged, on antitrust grounds, *inter alia,* an exclusive contract entered into by a hospital and an anesthesiology firm. With respect to the plaintiff's § 1 claim, the Court noted that, as in *Jefferson Parish,* the case was governed by the rule of reason. It also acknowledged, citing many of the same cases relied upon by Defendants herein, that other courts to have addressed similar challenges brought by physicians to exclusive medical services contracts have found that the relevant product market is that in which physicians compete for jobs, and that the market is nationwide in geographic scope. 137 F.Supp.2d at 969, *citing Balaklaw,* 14 F.3d at 799; *Collins,* 844 F.2d 473. Further, it noted that the defendants had "argue[d] and present[ed] evidence that the relevant product market is the market in which anesthesiologists compete for jobs, which, Defendants contend, is a national market." *Id.* at 968. It continued: "The Court agrees with the Defendants' contention that the relevant product market is that for anesthesiologists." *Id.* at 969. Defendants point to the preceding passage as proof that this Court has accepted, as a matter of law, the market definition urged by the defendants in *Reddy* (Doc. # 129 at 15)-i.e., that it has held that the market in antitrust cases involving challenges to exclusive medical services contracts is the nationwide job market for physicians. Yet, Defendants ignore the following language, which was contained in a footnote within the above-quoted passage from *Reddy:* "Plaintiff has not presented contrary evidence [of the product or geographic markets]." *Id.* at 968 n. 31. Simply put, this reveals that the plaintiff's market definitions failed to survive summary judgment in *Reddy,* not because they were unsupported legally, but because they were unsupported factually.[9] Accordingly, the Court declines to sustain summary judgment on the basis

8. As Defendants illustrate in an extensive chart contained in their Reply brief (Doc. # 129 at 14–15), *Reddy* is also highly factually similar to the case *sub judice.*

9. This is further supported by the fact that, in *Reddy,* the Court went on to find that the plaintiff had presented no evidence that the hospital defendants possessed an anticompetitive market share, even assuming *arguendo* the propriety of his proposed market definitions. 137 F.Supp.2d at 969.

that Plaintiff's market definitions have been legally foreclosed.[10]

### b. *Plaintiff's Market Evidence*

■ Regardless of the fact that Plaintiff's market definitions may not be rejected as a matter of law, the Court does agree that summary judgment is proper with respect to his proposed definition of the geographic market.

In a recent entry, this Court addressed Defendants' Motion to Exclude Expert Opinions and Testimony of John Pisarkiewicz, Ph.D. *See* Doc. # 193.[11] Therein, the Court held that, although Dr. Pisarkiewicz could opine as to the relevant product market, his proffered testimony with respect to Plaintiff's proposed geographic market was inadmissible. The Court identified two related shortcomings of Dr. Pisarkiewicz's opinions with respect to the proposed geographic market that were fatal to his proposed testimony: that adjustments made by Dr. Pisarkiewicz to his LIFO–LOFI analysis[12] contradicted his proposed product market definition to an extent that resulted in his opinion being based upon unreliable methods and princi-

ples, and that said adjustments were incorrect as a matter of law, to the extent that they excluded data that would have tended to disprove the discreteness of Plaintiff's proposed geographic market. Specifically, by Dr. Pisarkiewicz's own account, he excluded from consideration radiology services that were incidental to services for which patients left the proposed 19–ZIP code area.[13] Given his proposed product market definition (the physician component of all diagnostic radiology services provided in a hospital setting), it was irrational to exclude radiology services merely because they accompanied services that were unavailable in Plaintiff's proposed geographic market—or, as in some cases, superior to services that were available in the proposed geographic market.

As the Court also noted in excluding Dr. Pisarkiewicz's testimony, the Sixth Circuit has held that "evidence indicat[ing] that a large proportion of consumers within the proposed area in fact turn to alternative sources of supply outside the proposed area [requires the rejection of] the market boundaries posited by the plaintiff." *Re/ Max Int'l, Inc. v. Realty One, Inc.*, 173

10. Nonetheless, there is no basis for Plaintiff's contention that the Court accepted his market claims when it sustained in part and overruled in part Defendants' Motion to Dismiss (Doc. # 126 at 30, *citing* 142 F.Supp.2d at 874). Instead, as Defendants note (Doc. # 129 at 13), the Court merely assumed therein that Plaintiff's market formulation was correct in order to comply with Fed.R.Civ.P. 12. Rule 56, which provides the standards governing the motion for summary judgment herein, compels the Court to make no such assumption; instead, it requires the Court to evaluate whether the evidence marshaled may prove the non-moving party's position.

11. Dr. Pisarkiewicz is an economist whose testimony Plaintiff desired to offer in support of his market definitions.

12. As the Court detailed in that entry, LIFO (Little In From Outside) and LOFI (Little Out From Inside) are the fundamental analytical

tools used by economists employing the Elzinga–Hogarty test. That test is used to evaluate proposed markets in antitrust cases and can prove a plaintiff's market definitions by demonstrating that relatively little product enters the market from outside the proposed geographic area and that relatively little product leaves the market from inside the proposed geographic area.

13. Dr. Pisarkiewicz excluded from consideration, *inter alia*, patients who received diagnostic radiology services for procedures for which more than 90% of patients left the proposed market. He also excluded from his analysis patients who sought services that were unavailable in "sufficient quantity or quality" in Plaintiff's proposed geographic market.

F.3d 995, 1017 (6th Cir.1999), *citing Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 346 (8th Cir.1995). Before making the untenable adjustments, Dr. Pisarkiewicz's data plainly showed that a substantial portion of patients residing within his proposed geographic market left that market in order to obtain products similar to those offered by the Defendants herein. Other courts to address the usage of these market tests in the medical services context agree that such out-migration of patients for the given product belies a plaintiff's geographic market definition. In *California v. Sutter Health System*, 130 F.Supp.2d 1109 (N.D.Cal.2001), an antitrust case challenging the merger of two hospitals, the court explained that

> [w]here a hospital outside of the proposed geographic market draws patients from the same region from which the merging hospitals draw their patients, the hospital located outside of the test market is considered a practical alternative to which patients residing in the area of overlap can turn for acute inpatient services.

*Id.* at 1073. *See also, Fed. Trade Comm'n v. Freeman Hosp.*, 911 F.Supp. 1213, 1218, 1220 (W.D.Mo.), *aff'd,* 69 F.3d 260 (8th Cir.1995) (noting in the course of denying the plaintiff's request for a preliminary injunction to prevent two hospitals from merging that "[i]f the service area residents currently use other hospitals, then those hospitals are considered alternatives to the [hospitals within the proposed geographic market]."). For the reasons explained in this Court's entry regarding the admissibility of Dr. Pisarkiewicz's testimony, the adjustments made to the Elzinga–Hogarty data rendered his testimony unreliable. Disregarding the results of the Elzinga–Hogarty test that were reached via those unjustified refinements, leaves the Court with results indicating that substantial numbers of patients within Plaintiff's proposed geographic market actually go elsewhere to purchase products similar to those offered by the Defendants herein.[14] Since this belies, as a matter of law, the finding of a true market (i.e., the market is not actually contained by the geographic boundaries posited by Plaintiff), Plaintiff has failed to offer evidence of a geographic market on which a jury could rely to find that Defendants possessed market power.[15]

**14.** Plaintiff has also submitted the expert report of William C. Hillman (Doc. # 101). Hillman, who is offered as an expert in health care and hospital management and administration, would testify regarding Defendants' market share in the two-county area. However, Hillman has no professional or educational background in economics and Plaintiff does not rely in his memorandum opposing summary judgment on Hillman's report to argue with respect to evidence of relevant product or geographic markets. *See* Doc. # 126 at 40–44 (relying exclusively on Dr. Pisarkiewicz's report to support the validity of Plaintiff's market analysis). In fact, Hillman himself professed a lack of familiarity with or understanding of the Elzinga–Hogarty test and specifically of Dr. Pisarkiewicz's analysis of out-migration of patients from the proposed geographic area (Hillman Depo. at 59). This is a possible explanation for Plaintiff's reliance on Dr. Pisarkiewicz's analysis, as opposed to Hillman's. Regardless, Hillman's report indicates that a majority of residents in the proposed geographic market utilized hospitals other than those operated by Defendants. Specifically, Hillman found that, in 1996, Mercy Medical Center's market share was 32.6% in Clark County and 15.7% in Champaign County, and that Mercy Memorial Hospital's market share was 25.1% in Champaign County and virtually non-existent in any other county (Doc. # 101, Tab 2 at 22).

**15.** By way of a footnote, Plaintiff asserts that Mercy's failure to object to Dr. Osborn's operation of an outpatient imaging center in the eastern part of Dayton, despite the existence of a non-compete provision in DIA's contract with Mercy that, according to Plaintiff, "appeared to prohibit such operation," demon-

Accordingly, the Court concludes that the Defendants are entitled to summary judgment on Plaintiff's claim under the Sherman Act, because the evidence fails to raise a genuine issue of material fact concerning the geographic market he has proposed.[16]

### 2. Antitrust Injury

In the alternative, the Defendants argue that they are entitled to summary judgment on Plaintiff's claim under the Sherman Act, because the evidence fails to raise a genuine issue of material fact concerning the question of whether he has suffered an antitrust injury. The requirement that a plaintiff bringing a claim for a violation of the Sherman Act show an antitrust injury flows from § 4 of the Clayton Act, 15 U.S.C. § 15, which authorizes a private right of action for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." In *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), the Supreme Court summarized the standards pertaining to antitrust injury:

A private plaintiff may not recover damages under § 4 of the Clayton Act merely by showing "injury causally linked to an illegal presence in the market." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct.

690, 50 L.Ed.2d 701 (1977). Instead, a plaintiff must prove the existence of "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Ibid. (emphasis in original). In *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), we reaffirmed that injury, although causally related to an antitrust violation, nevertheless will not qualify as "antitrust injury" unless it is attributable to an anti-competitive aspect of the practice under scrutiny, "since '[i]t is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition." Id., at 109–110, 107 S.Ct. 484 (quoting *Brunswick, supra,* 429 U.S., at 488, 97 S.Ct. 690). See also *Associated General Contractors of California, Inc. v. Carpenters,* 459 U.S. 519, 539–540, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 483, and n. 19, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981).

*Id.* at 334, 110 S.Ct. 1884. *See also, In re Cardizem CD Antitrust Litigation,* 332 F.3d 896, 909–10 (6th Cir.2003). In *Valley Products v. Landmark,* 128 F.3d 398 (6th Cir.1997), the Sixth Circuit reviewed its

---

strates Defendants' own belief that such a location was outside of the relevant geographic market. Doc. # 126 at 44 n. 23. Yet, according to Plaintiff, such a non-hospital imaging center is not part of the relevant *product* market. *See supra* note 2. Therefore, by Plaintiff's own account, Mercy's failure to object to Dr. Osborn's imaging center was related to the nature of the services offered at the center and not to its geographic location.

**16.** This conclusion should not be confused with a determination of the sort that the Court declined to reach *supra,* that Plaintiff is

legally foreclosed from offering evidence that would support the definitions offered by him herein. For reasons already explained, the Court does not agree with Defendants' argument that the market definitions in this case have necessarily been decided as a matter of law by courts in other factually similar cases. That said, the Court does agree that Plaintiff's failure to offer suitable economic evidence that would support his proffered geographic market definition precludes the definition's legal validity, such as to withstand summary judgment, and, thus, for trial purposes.

jurisprudence relating to the antitrust injury doctrine:

The Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation.

In *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105 (6th Cir.), *cert. denied*, 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989), this court dealt with a situation where the plaintiff, a European manufacturer of armature winding machines, hoped to get into the business of manufacturing such machines in the United States. The plaintiff found itself foreclosed from entering the U.S. market after the defendant, an American subsidiary of a European competitor, obtained key patents from one American manufacturer and took over a second American manufacturer, a company holding a license to use the patents. Although the defendant's takeover of the latter company was assumed to violate § 1 of the Sherman Act and § 7 of the Clayton Act, our court did not view the antitrust violation as having inflicted the requisite antitrust injury. The harm of which the plaintiff complained, as the *Axis* panel saw it, was a direct result of the plaintiff's inability to obtain the patents, or a license to use the patents—and this harm did not "flow from" the element of the takeover that created the antitrust problem. *Id.* at 1112, quoting *Brunswick*, 429 U.S. at 489, 97 S.Ct. 690.

The plaintiff in *Axis* never became a competitor in the American market, and the panel observed by way of dictum that perhaps a competitor could have stated a claim for damages. *Axis*, 870 F.2d at 1111–12. But the plaintiffs in *Hodges v. WSM, Inc.*, 26 F.3d 36 (6th Cir.1994), appear to have been in compe-

tition with two of the defendants in that case (Grand Ole Opry Tours and Opryland USA) for a short time prior to the advent of an allegedly illegal market-sharing agreement in the Nashville sightseeing tour and airport shuttle market. We nonetheless held in Hodges that the plaintiff shuttle operators could not claim antitrust injury when denied permission to drive their vans past the gates of the defendants' Opryland complex.

"It was Opryland's refusal to allow Plaintiff's vans on its property which caused Plaintiff's injury. If Plaintiff would have suffered the same injury without regard to the allegedly anticompetitive acts of Defendants, Plaintiff has not suffered an antitrust injury." *Id.* at 38 (quoting district court opinion). In other words, as the Hodges panel put it, a violation of the antitrust laws was not a "necessary predicate" to the plaintiffs' loss of business:

"Because plaintiffs did not allege, nor could they, that the illegal antitrust conduct was a necessary predicate to their injury or that defendants could exclude plaintiffs only by engaging in the antitrust violation, it was appropriate to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Id.* at 39.

*Id.* at 403–04.

In an earlier Decision, this Court applied those principles and concluded that the Plaintiff had adequately pled antitrust injury. *Nilavar, supra*, 142 F.Supp.2d at 869–76. In particular, this Court wrote:

As to specific allegations of an antitrust injury, Plaintiff has alleged that he practiced radiology in the alleged relevant geographic market, and that he competed in the physician diagnostic radiology services market. He further alleges the following injuries as a result of

Defendants' conduct: 1) that his and other physicians' ability to compete in the market for physician diagnostic radiologic services has been restrained or eliminated; 2) that purchasers of physician diagnostic radiologic services in the area centered around Springfield and Urbana have been deprived of free and open competition in the sale of such services; 3) that competition regarding the price and quality of physician diagnostic radiologic services in the relevant market have been suppressed; 4) that patient care in the relevant geographic market has been harmed by the lack of competition; 5) that quality assurance and pooling of knowledge have been drastically reduced; 6) that patients and referring physicians in the relevant geographic market have been deprived of the choice of physician diagnostic radiology service providers; 7) that a significant number of consumers of physician diagnostic radiology services are now forced to purchase such services from DIA when they would prefer other physicians; and 8) that patients and referring physicians have been deprived of information regarding the quality of physician diagnostic radiology services. In short, Dr. Nilavar alleges that, as a result of Defendants' conduct, his ability to compete has been restrained, resulting in higher prices, lower quality services, and less choice for consumers and their physicians. These allegations constitute the kind of injuries that the antitrust laws were enacted to prevent.

*Id.* at 874.

■ Rather than expressly arguing that the evidence fails to raise a genuine issue of material fact as to whether Plaintiff's ability to compete was restrained, resulting in lower quality services and less choice for consumers and physicians, the types of injuries antitrust laws were enact-

ed to prevent, Defendants contend that the evidence fails to raise such an issue, because Plaintiff was merely denied staff privileges at one hospital as a result of the exclusive contract between Mercy and DIA. In support of that argument, the Defendants rely upon *Leak v. Grant Medical Ctr.*, 893 F.Supp. 757 (S.D.Ohio 1995), *aff'd*, 1996 WL 721695 (6th Cir.1996) (affirming on the basis of the District Court opinion), *cert. denied*, 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 175 (1997). Therein, a physician who specialized in pain management and his medical corporation brought an action based upon federal antitrust laws against a hospital (Grant Hospital) which had denied him staff privileges and the medical corporation which had been awarded an exclusive contract to provide anesthesia services to the hospital. The District Court granted summary judgment in favor of the defendants on those claims, concluding that the plaintiffs had not suffered an antitrust injury. After reviewing pertinent authorities, the *Leak* court initially stressed that those authorities had not established a per se rule that a health care professional could never suffer an antitrust injury as a result of being denied privileges by one hospital. *Id.* at 763. Nevertheless, the court concluded that the plaintiff therein had not suffered an antitrust injury, since the only injury of which he complained was that the insurance plans of some of his patients limited them to Grant Hospital. Since the *Grant* court eschewed the existence of a per se rule, this Court is compelled to reject the Defendants' argument that merely depriving the Plaintiff of the right to practice radiology at one hospital does not, as a matter of law, constitute an antitrust injury.

■ Defendants also argue that the Plaintiff has failed to establish an antitrust injury, because the exclusive contract be-

tween Mercy and DIA was the result of competition between radiology providers. In support of that argument, the Defendants rely upon *Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir.1994). Therein, a physician who was president of a group of anesthesiologists which had previously been the *de facto* exclusive provider of anesthesiology services at a hospital in Cortland, New York, brought suit after that group had lost in the competition to obtain an express contract to be the exclusive provider of such services at that hospital. In particular, the plaintiff alleged that the exclusive contract between the hospital and the new provider of anesthesiology services violated the Sherman Act. In affirming the grant of summary judgment in favor of defendants, the Second Circuit concluded that the plaintiff had not suffered an antitrust injury as a result of losing that competition. The Second Circuit initially noted that the competition had merely resulted in a "reshuffling of competitors." *Id.* at 798 (internal quotation marks and citation omitted). In the closing portion of its opinion, the *Balaklaw* court summarized and explained its conclusions:

> "[I]t is the nature of competition that at some point there are winners and losers, and the losers are excluded." *Konik v. Champlain Valley Physicians Hosp. Medical Center*, 733 F.2d 1007, 1015 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). Here, Dr. Balaklaw entered the competition for an exclusive contract, he interviewed for it, and he lost. He was therefore excluded from further practice at CMH during the term of the contract. Especially in light of the Supreme Court's recognition that a hospital has the "unquestioned right to exercise some control over the identity and the number of doctors to whom it accords staff privileges," *Jefferson Parish [Hosp. Dist.*

*No. 2 v. Hyde*, 466 U.S. 2, 30, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) ], and the frequently expressed judicial approval of exclusive contracts for medical services, *see, e. g., id.* at 43–44, 104 S.Ct. 1551 (O'Connor, J., concurring); *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir.1992); *Beard v. Parkview Hosp.*, 912 F.2d 138, 140 (6th Cir.1990); *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 478–79 (7th Cir.1988); *Coastal Neuro–Psychiatric Assocs. v. Onslow Memorial Hosp.*, 795 F.2d 340, 342 (4th Cir.1986), such exclusion is not enough to constitute an antitrust injury. As we said in *Konik*, "the Hospital is not required to open its operating rooms to any and all anesthesiologists who wish to practice there." 733 F.2d at 1015. By closing it doors to Dr. Balaklaw in favor of one of his competitors, CMH did nothing to inflict an injury of the type the antitrust laws were intended to prevent.

*Id.* at 801–02. This Court finds the result reached and the rationale employed by the Second Circuit in *Balaklaw* to be persuasive and will follow same. In its earlier Decision, this Court declined to dismiss the Plaintiff's antitrust claims under Rule 12(b)(6), on the basis of *Balaklaw*, because the Plaintiff had not alleged in his Complaint that the decision to award the contract to DIA was the result of competition. 142 F.Supp.2d at 877. Therefore, it turns to the question of whether the evidence raises a genuine issue of material fact on whether the exclusive contract between Mercy and DIA was not the product of a competitive process.

It is not controverted that prior to 1996, when DIA became the exclusive provider of radiology services, SRI, the radiology group with which Plaintiff was associated, was the *de facto* exclusive provider of such services at Mercy, although the parties did

not have a contract to that effect.[17] Beginning in 1993, Mercy negotiated with SRI for two years to enter into such an express contract. When those negotiations proved fruitless, Mercy issued a Request for Proposals to provide those services, which ultimately resulted in DIA becoming that provider. Moreover, the evidence also establishes that SRI submitted such a proposal. However, DIA rather than SRI was selected to become the exclusive provider. Indeed, Mercy received responses from seven radiology groups in response to that request. Nevertheless, Plaintiff argues that the evidence raises a genuine issue of material fact as to whether the award of that contract resulted from competition. In particular, the Plaintiff points to the fact that the vast majority of the members of the physician review committee, which recommended that DIA be selected as the exclusive provider of radiology services, were loyal to Mercy.[18] Given that this committee was established to recommend the exclusive provider of radiology services at its hospitals, it is not surprising that the members of that committee were loyal to Mercy. More to the point, the fact that the members of the committee were loyal to Mercy, rather than to DIA and Plaintiff, does not raise a genuine issue of material fact as to whether the process to select the exclusive provider of radiology services was non-competitive, given that Mercy was not competing with DIA or, for that matter, with SRI.

In sum, the uncontroverted evidence establishes that SRI had been the *de facto*

exclusive provider of radiology services at Mercy, only to be replaced by DIA at the conclusion of a competitive process. Therefore, Plaintiff lost the right to practice at the Mercy hospitals as a result of a "reshuffling of competitors." Accordingly, the Court concludes that the evidence fails to raise a genuine issue of material fact as to whether Plaintiff suffered an antitrust injury and concludes that Defendants are entitled to summary judgment on Plaintiff's claim under the Sherman Act (Count Two) for that reason.

3. *Evidence Fails to Raise a Genuine Issue of Material Fact as to whether Defendants' Alleged Violation of the Sherman Act Was the Proximate Cause of Plaintiff's Injury*

■ A plaintiff asserting a claim under the Sherman Act must not only establish that the defendant violated that statute, but also that this violation was the proximate cause of his injuries. *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 788–89 (6th Cir.2002), *cert. denied*, 537 U.S. 1148, 123 S.Ct. 876, 154 L.Ed.2d 850 (2003); *Ezzo's Inv., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 990 (6th Cir. 2001). In an earlier Decision, the Court reviewed Plaintiff's theory of causation:

To be clear, Plaintiff has alleged that "but for" the exclusive contract, he would still be practicing in the Springfield–Urbana area. Thus, he has alleged that the contract, allegedly in violation of the antitrust laws, was a necessary predicate to his injury.

---

**17.** For instance, during his deposition, the Plaintiff identified only two radiologists who were not members of SRI who had provided services at Mercy for a short period of time in the very early 1990's.

**18.** Plaintiff also points out that he and most other members of SRI were not told by Dr.

Osborn that he was forming DIA or were not invited to join that group. Plaintiff does not explain, however, why the behavior of a former partner, which is assumed to have been traitorous, rendered the process of selecting an exclusive provider radiology services something other than competitive.

142 F.Supp.2d at 875. The Defendants argue that they are entitled to summary judgment on Plaintiff's claim under the Sherman Act, because the evidence fails to raise a genuine issue of material fact as to whether their alleged violation of the Sherman Act was the proximate cause of Plaintiff's injury. For reasons which follow, the Court disagrees.

Defendants point to statements by the Plaintiff that he was not practicing radiology in the Springfield–Urbana area for a host of reasons other than the exclusive contract between Mercy and DIA. For instance, Plaintiff has previously identified his severe depression and obsessive/compulsive disorders, an inability to focus and to concentrate, as well as Dr. Osborn's actions as the reasons why he is not practicing radiology. Nevertheless, Plaintiff argues that the evidence raises a genuine issue of material fact concerning proximate cause, because his psychiatric experts have testified during their depositions that his mental disabilities stem, in part, from his loss of privileges which was a necessary result of the exclusive contract. Construing the evidence in the manner most favorable to the Plaintiff, the party against whom summary judgment has been sought, the Court concludes that the evidence raises a genuine issue of material fact concerning proximate cause. A reasonable jury could find that, although the Plaintiff is not practicing medicine because of his disabilities, those disabilities were caused, in part, by his loss of privileges which was unquestionably a result of the exclusive contract for the provision of radiology services between Mercy and DIA.

Accordingly, the Court rejects the Defendants' assertion that they are entitled to summary judgment because the evidence fails to raise a genuine issue of material fact on the question of proximate cause.

### 4. *The Limited Term of the Exclusive Contract Between Mercy and DIA Preserved Competition*

The exclusive contract into which Mercy and DIA entered in December, 1995, was nominally effective for two years; however, Mercy had the right to terminate at the end of one year, with or without cause, upon 90 days notice to DIA. The Defendants argue that they are entitled to summary judgment on Plaintiff's claim under the Sherman act, because courts have found that exclusive contracts with short durations are presumed not to restrain trade. This Court agrees.

In its earlier Decision, this Court noted that a number of courts have looked to the duration of an exclusive contract as one of many factors to consider when determining whether the contract restrained trade. 142 F.Supp.2d at 877. The Court also noted that the length of the exclusive contract did not seem to retrain trade unreasonably, since it appeared that there would be an opportunity to compete in the future. *Id.* at 878. However, this Court declined to dismiss Plaintiff's claim under the Sherman Act, because the supposed opportunity to compete in two years or less might be illusory. *Id.* In reaching that conclusion, the Court noted that Plaintiff had alleged that the he was unable to secure privileges at Springfield Community Hospital and that, as a result, he has been entirely foreclosed from the Springfield–Urbana physician diagnostic radiology services market due to the contract between DIA and Mercy. *Id.* The Court reasoned that, as a consequence, it was unlikely that Plaintiff or other similarly-situated radiologists would remain in that area for two years, pending the opportunity to seek a contract with Mercy, or for some shorter period hoping that it would decide to terminate the contract. *Id.*

The evidence, however, indicates that those potentialities have not come to pass. For instance, the Plaintiff has continued to reside in the Springfield–Urbana area far more than for the two-year period of the initial contract between Mercy and DIA. Thus, he did have the ability to compete for the renewal of that contract. In addition, he did not seek privileges at Springfield Community Hospital after January 1996, the first month in which he was without privileges at the Mercy hospitals. Indeed, given that the Plaintiff had not made an effort to obtain employment in the first six years after he had lost those privileges, it cannot be said that he has been denied the ability to compete in the Springfield–Urbana area or any other area as a result of the exclusive contract between Mercy and DIA.

Based upon the foregoing, the Court sustains the Defendants' Motion for Summary Judgment (Doc. # 117), as it relates to Plaintiff's antitrust claim under the Sherman Act, Count One of his Complaint.

### B. *Ohio Antitrust Statute (Count Three)*

Plaintiff's Third Count is a claim under Ohio's Valentine Act, Chapter 1331 of the Ohio Revised Code, alleging that the exclusive contract is a restraint of trade. The Valentine Act was patterned after the federal Sherman Act and, therefore, the Ohio Supreme Court interprets its language in light of federal judicial construction of the Sherman Act. *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St.2d 201, 204, 407 N.E.2d 507 (1980); *Johnson v. Microsoft Corp.* 155 Ohio App.3d 626, 802 N.E.2d 712 (2003), *reconsideration denied,* 156 Ohio App.3d 249, 805 N.E.2d 179 (2004). *See also, Richter Concrete Corp. v. Hilltop Basic Resources,* 547 F.Supp. 893, 920 (S.D.Ohio 1981), *aff'd,* 691 F.2d 818 (6th Cir.1982) (plaintiff's failure to prove its claims under Sherman Act

was a failure to prove claim under Valentine Act).

Accordingly, because Defendants are entitled to summary judgment on Plaintiff's claim under the Sherman Act, for the reasons set forth above, summary judgment is also proper with respect to his counterpart, state law claim under the Valentine Act.

### C. *Breach of Contract (Count Eight)*

Plaintiff alleges that Defendants are liable for breach of contract under Ohio common law by virtue of terminating his staff privileges without prior notice or hearing, in violation of the medical staff bylaws—herein, Mercy's Credentials Policy Manual ("CPM"). Defendants argue that they are entitled to summary judgment on this theory, because the CPM does not constitute a contract between Mercy and Dr. Nilavar.

The Ohio Supreme Court has recognized that there is a split of authority as to whether a hospital's medical staff bylaws may bind the hospital:

A review of cases from other jurisdictions shows there is a split of authority over whether a hospital's staff bylaws contractually bind the hospital to follow those bylaws. Some cases say that staff bylaws do contractually bind the hospital. *See Berberian v. Lancaster Osteopathic Hospital Assn., Inc.* (1959), 395 Pa. 257, 149 A.2d 456; *Terre Haute Regional Hospital, Inc. v. El–Issa* (Ind. App.1984), 470 N.E.2d 1371; *Clemons v. Fairview Medical Center, Inc.* (Ala. 1984), 449 So.2d 788. Some cases hold that staff bylaws do not contractually bind the hospital. *Manczur v. Southside Hospital* (1959), 16 Misc.2d 989, 183 N.Y.S.2d 960; *Leider v. Beth Israel Hospital Assn.* (1960), 33 Misc.2d 3, 229 N.Y.S.2d 134, *affirmed* (1962), 11 N.Y.2d 205, 227 N.Y.S.2d 900, 182 N.E.2d 393; *Natale v. Sisters of Mercy* (1952), 243

Iowa 582, 52 N.W.2d 701. The cases holding that a hospital is bound by its staff bylaws base their decisions on the reasoning that if the hospital is not bound by the bylaws, then essentially the bylaws would be meaningless. The cases holding that a hospital is not bound by its staff bylaws base their decisions on the reasoning that there is no consideration or mutuality of obligation between the parties and therefore the staff bylaws are not a binding contract. * * *

*Bouquett v. St. Elizabeth Corp.*, 43 Ohio St.3d 50, 52, 538 N.E.2d 113, 115 (1989), *quoting Munoz v. Flower Hosp.*, 30 Ohio App.3d 162, 166, 507 N.E.2d 360, 364–65 (1985). Accordingly, the analysis herein must proceed to the language of the bylaws to determine whether the parties intended to be bound. *Id.*[19]

The CPM governs the relationship between the hospital and the physicians who have staff privileges there. As the Court noted when it addressed the motion to dismiss, the CPM consists of six articles, to wit: 1) application, appointment and reappointment, 2) clinical privileges, 3) corrective action, 4) hearings and appellate reviews, 5) confidentiality, immunity and release, and 6) relationship of medical staff membership and contractual services. 142 F.Supp.2d at 892. Although none of these articles sheds light on the parties' intent, if any, to be contractually bound, the preamble of the CPM does contain this language:

> This Manual, with its policies and forms, is approved by the Governing Body [of Mercy Hospital] upon recommendation of the Executive Committee of the Medical Staff. Recommendations for amendment and revision may be forwarded to the Governing Body after an affirmative vote of a majority of the Members of the Executive Committee after consultation with the Credentials Committee.

This language does not support an inference that mutuality of obligation exists between the parties to the CPM. Instead, it appears to provide that final approval of the CPM, and amendments thereto, rests solely with the Governing Body. Accordingly, it negates the argument that the CPM constitutes a contract.

▉ The language of the document itself notwithstanding, Plaintiff points to various extrinsic evidence that he believes supports his claim for breach of contract. Specifically, Plaintiff points to communications that were made during the "on-again, off-again negotiations" between Mercy and SRI for the exclusive contract that, he argues, demonstrate that the parties believed that the fate of the SRI radiologists' privileges following the institution of the exclusive contract with DIA was subject to negotiation (Doc. # 126 at 60–61).[20] The

---

19. Contrary to Defendants' argument, this issue was not resolved by the Court of Common Pleas of Clark County's decision in *Ahmad v. Mercy Health System–Western Ohio*, Case No. 99–CV–0394 (May 24, 2000). In that case, the court rejected a claim for breach of contract that was based on a hospital's bylaws. Plaintiff's claim for breach of contract herein, however, is based not on the hospital's bylaws, but on the hospital's *staff* bylaws. Those two types of bylaws are not synonymous. *See Munoz*, 30 Ohio App.3d at 165–66, 507 N.E.2d at 364.

20. Specifically, Plaintiff cites five documents for this purpose. The first is a letter from a lawyer for Mercy to a lawyer for SRI. The second is a letter from Michael J. Peterson, President/CEO of Mercy, to Stanley Nedelman, M.D., of SRI. Both letters refer to ¶ 13 of a draft agreement that, according to Plaintiff, required SRI physicians to surrender their privileges upon termination of an exclusive agreement (Doc. # 126 at 60–61). The third is a memorandum written by Peterson expressing dissatisfaction with the position taken by SRI in the negotiations. The fourth is the Request for Proposal disseminated by

first problem with Plaintiff's citation of these communications is that none of them can be construed as evidence of the intent of the parties to be bound by the CPM, because they are all concerned with negotiations for an exclusive radiology services contract of the sort that was eventually entered into by Mercy and DIA. Therefore, at most, the documents cited by Plaintiff would have been informative of the parties' intent had Mercy and SRI entered into an exclusive contract for the provision of radiology services. They do not, however, shed light on the intent of Mercy and *Plaintiff* with respect to the CPM.

*Second,* however, assuming *arguendo* that the documents cited by Plaintiff do stand for the proposition that the parties intended to bargain on the subject of privileges held by physicians prior to Mercy's awarding of the exclusive contract to DIA, this is not helpful to Plaintiff's claim for breach of contract, because, as Plaintiff successfully argued to this Court with respect to the motion to dismiss, he alleges that Defendants are liable for breach of contract because of their failure to afford Plaintiff due process upon the termination of his privileges and not because of the termination, itself. 142 F.Supp.2d at 894 ("[Plaintiff] alleges that MHS–WO and CHP breached their contract with him, by failing to provide him with the requisite notice and hearing, as required by Article IV of the [CPM].").

Since Plaintiff's breach of contract claim (Count Eight) is based on the CPM, and the CPM does not amount to a contract between Plaintiff and Defendants, sum-mary judgment is appropriate with respect to that claim.

### D. *Due Process (Count Seven)*

Plaintiff's due process claim relies on the same facts as his claim for breach of contract.[21] Specifically, he argues that Defendants' failure to give him notice and a pre-deprivation hearing regarding the termination of his privileges violated his due process rights, which are outlined in the CPM.

As the Court explained in its decision regarding the motion to dismiss, the Ohio Supreme Court has emphasized the importance of procedural due process, even in a private hospital:

> Where the board of trustees of a private, nonprofit hospital adopts reasonable, nondiscriminatory criteria for the privilege of practicing major general surgery in the hospital, and procedural due process is followed in adopting and applying such criteria, ... a court should not substitute its evaluation and judgment of such matters for those of the board of trustees.

*Khan v. Suburban Community Hosp.,* 45 Ohio St.2d 39, 340 N.E.2d 398 (Ohio 1976). Accordingly, "[c]ourts [in Ohio] have long held that physicians are entitled to procedural due process before a hospital may revoke their staff privileges." *Holt v. Good Samaritan Hosp. and Health,* 69 Ohio App.3d 439, 441, 590 N.E.2d 1318 (1990).

In its motion to dismiss, Defendants argued, *inter alia,* that the CPM did not confer due process rights in the particular

---

Mercy that required, *inter alia,* the radiologists chosen by Mercy for the exclusive contract to agree that any termination of the agreement, for any reason, would lead to the automatic termination of clinical privileges without appeal. The fifth is the minutes from

the SRI meeting of 12/27/94, noting due process problems posed by the proposed contract draft.

**21.** *But see infra* note 23, explaining the claims' differing legal bases.

circumstances at stake in this case. In overruling the motion, the Court closely analyzed the language of the CPM and concluded that it did not, in fact, unambiguously provide that a physician does not have a right to a hearing in this situation. 142 F.Supp.2d at 892–93 (noting that "although [the section of the CPM that addresses the expiration or termination of a contract] precludes hearing and appeal rights in many circumstances involving exclusive contracts, it does not preclude such rights where an exclusive contract is entered into in the first instance [as in the present case]").

Herein, Defendants again argue that the CPM may not be interpreted to have required due process in the present situation. However, there is one significant difference between Defendants' current argument and the one that was rejected by the Court when it overruled the motion to dismiss: Defendants now argue that Ohio law, and not the wording of the CPM herein, defeats Plaintiff's argument that due process was required in the situation at bar. For the reasons that follow, the Court agrees.

Specifically, Defendants argue that "[a] hospital board may terminate the privileges of a radiologist who has been expelled from membership in a group practice which has an exclusive contract with the hospital to provide services" (Doc. # 117 at 59). Defendants cite *Williams v.*

*Hobbs,* 9 Ohio App.3d 331, 335, 460 N.E.2d 287, 292 (Ohio App.1983), for this proposition. In that case, the court rejected a similar due process argument put forth by a radiologist whose staff privileges were terminated due to the formation of an exclusive contract between the hospital and another provider of radiology services. In so doing, the court cited other jurisdictions that have upheld such exclusive contracts as a reasonable exercise of a hospital's board of trustees' power to provide for the proper management of the hospital. *Id., citing Dattilo v. Tucson General Hospital,* 23 Ariz.App. 392, 533 P.2d 700 (1975); *Centeno v. Roseville Community Hospital,* 107 Cal.App.3d 62, 167 Cal.Rptr. 183 (1979); *Benell v. Virginia,* 258 Minn. 559, 104 N.W.2d 633 (1960); *Blank v. Palo Alto–Stanford Hospital Center,* 234 Cal. App.2d 377, 44 Cal.Rptr. 572 (1965); *Adler v. Montefiore Hospital Assn. of W. Pa.,* 453 Pa. 60, 311 A.2d 634 (1973).[22]

Subsequent courts have further explained the propriety of refusing to apply the due process protections identified above in the way urged herein by Plaintiff. Specifically, in *Holt v. Good Samaritan Hosp. and Health Ctr.,* 69 Ohio App.3d 439, 590 N.E.2d 1318 (1990), the court reviewed a similar case in which a physician argued that the termination of his staff privileges from the defendant hospital, without notice or a hearing, violated his due process rights.[23] The court began

---

**22.** Of course, such exclusive contracts are not valid per se. For instance, although the Court has concluded above that the Defendants are entitled to summary judgment on Plaintiff's claims under federal and state antitrust laws, the Court has reached that conclusion because the evidence fails to raise genuine issues of material fact, rather than because exclusive contracts are per se valid.

**23.** In *Holt,* the plaintiff advanced three sources for his entitlement to due process, to wit: the common law, Ohio Revised Code

§ 3701.351(B) and contractual obligations allegedly created by the hospital's bylaws. 69 Ohio App.3d at 441, 590 N.E.2d at 1320. In this matter, Plaintiff does not advance § 3701.351(B) as a basis for his due process claim. Additionally, despite the factual similarities that the Court has noted between Plaintiff's breach of contract claim and that claiming a denial of due process, the Court understands the legal hook on which Plaintiff hangs the latter to be the one based in Ohio common law, which is analyzed in this section. (Even though it is the CPM that spells

by recognizing, as did the court in *Williams, supra,* that exclusive contracts for medical services are valid and enforceable. 69 Ohio App.3d at 442, 590 N.E.2d at 1320.

The court then thoughtfully analyzed the rationale underlying the right to due process held by physicians who face termination of their staff privileges:

"It seems clear to us that this procedure presupposes *notification to the practitioner* that he has failed in his duties to the Hospital, his patients, or in the competent practice of medicine. Obviously a doctor faced with charges of this kind must be given a *due process opportunity to defend himself.*"

69 Ohio App.3d at 443, 590 N.E.2d at 1321, *quoting Anne Arundel Gen. Hosp., Inc., v. O'Brien,* 49 Md.App. 362, 371, 432 A.2d 483, 488 (1981). The portion of *O'Brien* quoted by *Holt* indicates that the plaintiff physicians conceded that the hospital had a right to enter into the exclusive contract to provide services needed for the proper operation of the hospital. *O'Brien,* therefore, concluded that

"[i]t necessarily follows that under these circumstances the Hospital had no obligation to grant privileges to radiologists who might compete with [the firm to which the exclusive contract was awarded].... No suggestion is made that the [plaintiffs] were in any way incompetent or failed to conduct themselves properly

while their contract with the Hospital was in effect. There is nothing to defend [at any proposed hearing]."

*Id., quoting O'Brien,* 49 Md.App. at 372–73, 432 A.2d at 488–89. The same was also true in *Holt,* as the court noted that

[w]hile Holt is prevented from providing services in [the defendant's] emergency room because of his refusal to associate himself with [the firm that entered the exclusive contract with the defendant], neither his professional reputation nor his ability to practice medicine in general is in any way placed in jeopardy by the hospital's actions.... While Holt has a constitutionally protected right to practice medicine, he does *not* have a right to practice in any *particular hospital.*

*Id., quoting Gotsis v. Lorain Cmty. Hosp.,* 46 Ohio App.2d 8, 17, 345 N.E.2d 641, 646 (1974) (emphasis in original).

 Finally, the same is also true here. Although Defendants' exclusive contract prevents Plaintiff from practicing at Mercy Hospitals, such is not for any reason that relates to his professional duties or his medical competence.[24] Were the Court to adopt Plaintiff's interpretation of the due process right at issue herein, the judgment of hospital boards everywhere would be supplanted and their discretion to enter exclusive provider contracts (a practice that, as of now, is deemed universally valid) would be eliminated. As *Holt* noted,

out the procedure/process that Plaintiff believes was due to him, the Court reads the basis of the due process cause of action, as developed by the Ohio court decisions cited herein, to exist independently of any supposed *contractual relationship* between the physician and the hospital.) Regardless, no contract theory of due process is currently available to Plaintiff, because the Court has rejected, *supra,* his argument that the CPM amounted to a contract between himself and Mercy.

**24.** It is true that, unlike Dr. Holt, Dr. Nilavar did not refuse to associate with the firm with which Mercy contracted for the exclusive arrangement; instead, he was excluded from that group. However, for the purposes of the due process analysis, this is a distinction without a difference. Exactly like Dr. Holt, neither Dr. Nilavar's reputation nor his ability to practice medicine was compromised by Mercy's actions.

such an interpretation "would be the death knell of exclusive contracts for medical services. Once having entered into a contract with a provider corporation, a hospital would be locked into continuing the association until the unlikely event that every member physician either ceased practicing medicine or lost his privileges due to incompetency." 69 Ohio App.3d at 444, 590 N.E.2d at 1321.

Accordingly, the Court agrees that the termination of Plaintiff's privileges at Mercy, because of the exclusive contract entered into between Mercy and DIA, does not implicate the concerns animating a physician's right to notice and a hearing prior to the termination of his privileges. Therefore, summary judgment is proper with respect to Plaintiff's due process claim (Count Seven) under Ohio law.

### E. Tortious Interference (Count Four)

Plaintiff's Fourth Count alleges that Defendants interfered with his business relationships with patients, referring physicians and insurers by terminating his clinical privileges at the Mercy hospitals. In overruling Defendants' motion to dismiss this claim, the Court described the claim of tortious interference in the following manner:

> A claim for tortious interference with contractual relations occurs, *inter alia,* when a person, without a privilege to do so, purposefully causes a third party not to enter into a contract with another. *A & B–Abell Elevator v. Columbus/Cent. Ohio Bldg.,* 73 Ohio St.3d 1, 651 N.E.2d 1283 (1995); *Kand Med. v. Freund Med. Prods.,* 963 F.2d 125 (6th Cir.1992). In order to determine the existence of a privilege, the fact-finder must consider: "(a) the nature of the actor's conduct;

> (b) the nature of the expectancy with which his conduct interferes; (c) the relation between the parties; (d) the interest sought to be advanced by the actor; and (e) the social interest in protecting the expectancy on the one hand and the actor's freedom of action on the other hand." *Juhasz v. Quik Shops, Inc.,* 55 Ohio App.2d 51, 57, 379 N.E.2d 235, 238 (1977).

142 F.Supp.2d at 886.

On the basis of *Holt v. Good Samaritan Hosp. and Health Ctr.,* which is discussed above in connection with the analysis of the legitimacy of exclusive contracts for medical services, the Court recognized that Mercy's formation of a *valid* contract with DIA would provide a privilege to Defendants, such that they would not be liable for tortious interference even if their actions had caused Plaintiff's patients, referring physicians and insurers at Mercy not to enter into contractual relationships with him. *Id.* at 887. This Court explained that "[a]ssuming that the contract at issue in this litigation is valid, Defendants undoubtedly would be entitled to dismissal of Plaintiff's tortious interference claim." *Id.* Of course, compelled by Rule 12 to assume that the contract was *not* valid (i.e., that it violated federal and state antitrust laws), the Court, at that point, refused to dismiss Plaintiff's tortious interference claim.

In that the Court is no longer required to accept Plaintiff's allegations as true, Defendants urge that Plaintiff's tortious interference claim must fall with his antitrust claims (Doc. # 117 at 62).[25] Given that the Court has already sustained summary judgment as to Plaintiff's antitrust claims, the Court agrees that Plaintiff is now precluded from succeeding on his tor-

---

**25.** Plaintiff agrees that his claim for tortious interference is tied to his antitrust claims

(Doc. # 126 at 62).

tious interference claim. Accordingly, summary judgment is proper with respect to Count Four.

### F. Civil Conspiracy (Count Six)

 Finally, Plaintiff alleges that Defendants entered into a malicious combination and conspiracy to injure him by forcing him out of Mercy Hospitals and denying him the ability to practice his medical specialty. The Supreme Court of Ohio defines civil conspiracy as " 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.' " *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863, 866 (1995), *quoting LeFort v. Century 21—Maitland Realty Co.*, 32 Ohio St.3d 121, 512 N.E.2d 640, 645 (1987); *Aetna Casualty and Surety Co. v. Leahey Construction Co., Inc.*, 219 F.3d 519, 534 (6th Cir.2000). In order to establish a claim of civil conspiracy, the following elements must be proven: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 90 Ohio App.3d 284, 629 N.E.2d 28, 33 (1993); *Aetna*, 219 F.3d at 534.

As the Court recognized when it overruled Defendants' motion to dismiss this claim, "[a] civil conspiracy claim cannot succeed without an underlying unlawful act." 142 F.Supp.2d at 889, *citing Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998). It continued:

> Where all the substantive causes of action on which a conspiracy claim is based are without merit, a conspiracy claim must also fail. *El–Shiekh v.*

*Northwest Ohio Cardiology Consultants,* 2000 WL 1298761 (Ohio App. Sept. 15, 2000). "The general rule is that a conspiracy cannot be made the subject of a civil action unless something is done which, without the conspiracy, would give a right of action." *Minarik v. Nagy*, 8 Ohio App.2d 194, 195–96, 193 N.E.2d 280, 281 (1963). Accordingly, a plaintiff may not bring a claim for conspiracy unless he can also state a claim for the underlying cause of action. *See Hollinghead v. Bey*, 2000 WL 1005205 (Ohio App. July 21, 2000) (dismissing conspiracy claim because the malicious prosecution claim, the underlying cause of action, was barred by the statute of limitations).

*Id.* Defendants now argue that the absence of viable substantive claims precludes, as a matter of law, Plaintiff's civil conspiracy claim (Doc. # 117 at 62–63). In light of the entry of summary judgment on each of Plaintiff's substantive claims herein, the Court agrees. Therefore, summary judgment with respect to Plaintiff's claim for civil conspiracy (Count Six) is proper.

Based on the foregoing, the Court sustains Defendants' Motion for Summary Judgment (Doc. # 117).[26] As a result of the Court's rulings herein, and those which proceeded it, only Count Nine, a claim for intentional infliction of emotional distress, which was added after the Defendants had requested summary judgment, remains to be resolved in this litigation.

### III. Plaintiff's Rule 56(f) Cross–Motion (Doc. # 125)

Plaintiff has filed an Alternative Cross–Motion Pursuant to Rule 56(f) in Response to Defendants' Motion for Summary Judgment (Doc. # 125), asking the Court to postpone its consideration of Defendants'

---

**26.** In addition, each party's request for oral argument is denied.

motion for summary judgment. For the reasons that follow, Plaintiff's motion is overruled.

Federal Rule of Civil Procedure 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

The Sixth Circuit has explained that Rule 56(f) "is not a shield that can be raised to block a motion for summary judgment without even the slightest showing by the opposing party that his opposition is meritorious." *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 409 (6th Cir. 1998), *quoting Emmons v. McLaughlin*, 874 F.2d 351, 356 (6th Cir.1989). Instead, "[t]he nonmoving party must show how postponement of a ruling on the motion will enable him to rebut the motion for summary judgment." *Id.*

■ The discovery that Plaintiff sought to conduct, during the requested postponement of the Court's decision on summary judgment, includes follow-up depositions of individuals who have already been deposed in this matter and the review of documents that, Plaintiff believes, "Defendants have withheld pursuant to unlawful claims of attorney-client privilege" (Doc. # 125 at 1–2). Plaintiff believes that said discovery will "uncover further evidence in support of Plaintiff's claim of an antitrust conspiracy and related causes of action" (*Id.* at 2).[27]

In view of the fact that summary judgment is proper with respect to Plaintiff's antitrust claims because of his failure to present viable evidence with respect to alleged market conditions, among other reasons, the Court disagrees that further discovery on this issues identified by Plaintiff would aid his opposition to Defendants' motion for summary judgment. Plaintiff has not identified any prospective discovery that bears on the issue of geographic market definition that would benefit from a postponement under Rule 56(f). Regardless of whether further discovery might aid Plaintiff in raising a genuine issue of material fact on the other bases on which Defendants seek summary judgment on Plaintiff's antitrust claims, the Motion for Summary Judgment on those claims would remain well taken, on the basis of his failure to create a genuine issue of material fact on the issue of the relevant geographic market. Further, although

---

**27.** Specifically, in his Reply, Plaintiff points to three discovery motions that were pending as of the date of the present motion and an additional discovery motion that was filed shortly after the present motion. Said motions include: Plaintiff's Combined Motions to Compel Production of Documents (Denying Defendants' Assertion of Attorney–Client Privilege) (Doc. # 104–1) and for Leave to Amend Verified Complaint (Doc. # 104–2) and Supplement thereto (Doc. # 106); Plaintiff's Motion to Compel (Doc. # 107); and Plaintiff's Motion to Compel Production of Documents, or in the Alternative, Motion to Disqualify Defendants' Expert Richard F. Tompkins (Doc. # 128). However, since that time, each of these motions has been either overruled or withdrawn. *See* Decision and Entry Overruling Plaintiff's Combined Motions to Compel Production of Documents (Denying Defendants' Assertion of Attorney–Client Privilege) (Doc. # 104–1) and for Leave to Amend Verified Complaint (Doc. # 104–2) (Doc. # 162) (refusing to compel discovery of written notes that were subject to the attorney-client privilege); Notation Order re Doc. # 106 (overruling same as moot); Agreed Order Relating to Discovery Motions (Doc. # 143) (Doc. #'s 107 and 128 withdrawn by Plaintiff).

Plaintiff also suggests that further discovery would aid his state law claims, he does not identify which particular state law claims would benefit from such postponement, and the Court does not believe that any of said state claims would so benefit.[28]

Accordingly, Plaintiff's Alternative Cross–Motion Pursuant to Rule 56(f) in Response to Defendants' Motion for Summary Judgment (Doc. # 125) is overruled.

---

28. Plaintiff's suggestion that the discovery sought would demonstrate the conspiratorial nature of Mercy's termination of his privileges implies that it could be beneficial to his civil conspiracy claim under Ohio law. Yet, as noted *supra,* Plaintiff's civil conspiracy claim may not survive absent an underlying unlawful act. Without evidence of said underlying act(s), Plaintiff's conspiracy claim must fail, because the conspiracy alone cannot be the basis for Plaintiff's cause of action.