*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0424p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA; COMMONWEALTH OF
KENTUCKY,

*Plaintiffs-Appellants,*

*v.*

DAIRY FARMERS OF AMERICA, INC.; SOUTHERN
BELLE DAIRY CO., LLC,

*Defendants-Appellees.*

No. 04-6318

---

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 03-00206—Karl S. Forester, District Judge.

Argued: July 19, 2005

Decided and Filed: October 25, 2005

Before: CLAY, GILMAN, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Robert B. Nicholson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. W. Todd Miller, BAKER & MILLER, Washington, D.C., Charles E. Shivel, Jr., STOLL, KEENON & PARK, Lexington, Kentucky, for Appellees. **ON BRIEF:** Robert B. Nicholson, James J. Fredricks, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., David Vandeventer, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellants. W. Todd Miller, Donald I. Baker, Kyle G. Manikas, BAKER & MILLER, Washington, D.C., Charles E. Shivel, Jr., Lizbeth A. Tully, Anthony J. Phelps, STOLL, KEENON & PARK, Lexington, Kentucky, Bobby R. Burchfield, McDERMOTT, WILL & EMERY, Washington, D.C., David A. Owen, Brian M. Johnson, Theodore R. Martin, GREENEBAUM, DOLL & McDONALD, Lexington, Kentucky, for Appellees.

---

## OPINION

---

CLAY, Circuit Judge. The government of the United States and the Commonwealth of Kentucky (collectively, "the government") appeal the district court's grant of summary judgment to Defendant Dairy Farmers of America, Inc. ("DFA") on the government's claim that DFA violated Section 7 of the Clayton Act, 15 U.S.C. § 18. The government alleges that DFA's partial acquisition

1

of Defendant Southern Belle Dairy Co., LLC ("Southern Belle") in 2002 had significant anticompetitive effects on the market for school milk in dozens of school districts in Kentucky and Tennessee. On appeal, the government specifically contends that 1) the district court erred in granting summary judgment to DFA without ruling on the government's claim that DFA's original agreement acquiring Southern Belle violated the Clayton Act; 2) the district court erred in granting summary judgment to DFA with respect to the government's claim that DFA's revised agreement acquiring Southern Belle violated the Clayton Act; and 3) the district court abused its discretion in failing to permit the government discovery on the revised agreement, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.

We agree with the government that the district court erred in failing to consider its claim that the original agreement violated the Clayton Act. Furthermore, we conclude that the district court's implicit grant of summary judgment to DFA on that claim was in error, and we **REVERSE** that claim and **REMAND** it to the district court for trial. We also conclude that the district court erred when it granted summary judgment in favor of DFA with respect to the government's claim regarding the revised agreement, and we **REVERSE** that claim and **REMAND** it to the district court for trial. We **AFFIRM** the district court's implicit denial of the government's request for further discovery under Rule 56(f) of the Federal Rules of Civil Procedure.

## BACKGROUND

### I.     Substantive Facts

#### A.     Introduction

This case involves a challenge by the government to the acquisition of Defendant Southern Belle by Defendant DFA and the Allen Family Limited Partnership ("AFLP"). The government alleges that this acquisition, as structured both in the original and revised agreements, has resulted in a monopoly on the market for school milk in over forty school districts in Kentucky and Tennessee, and that it has reduced competition substantially in almost fifty additional districts.

#### B.     The Entities Involved

##### 1.     *Dairy Farmers of America*

DFA, a Kansas corporation with its principal place of business in Kansas City, Missouri, is a milk marketing organization and the largest dairy farmer cooperative in the nation. DFA's primary purpose is marketing the raw, unprocessed milk of its dairy farmers to dairy processors. DFA also invests in dairy processors in order to allow DFA's farmer members to participate in the profits earned from the sale of the finished dairy-based products, and to secure an outlet for its members' raw milk.

##### 2.     *Southern Belle*

Southern Belle is a limited liability company formed in February 2002. Southern Belle owns a milk processing plant in Somerset, Kentucky, that bids on school milk contracts. Under the initial ownership structure of the company, fifty percent of the voting interests in Southern Belle was owned by the Allen Family Limited Partnership ("AFLP"), which is managed by Robert Allen ("Allen"), and fifty percent was owned by DFA. Allen had previously been an advisor to DFA's corporate board. In addition, Allen had earlier participated in another joint venture with DFA, in which he made a $21.7 million profit on a $1 million investment. According to Gary Hanman, the CEO of DFA, DFA partnered with Allen on Southern Belle because "we knew him, our experience has been great, our relationship has been perfect through the years." J.A. 1061.

The original agreement gave AFLP a "put option" that entitled it to sell its interests to DFA after three years at a price sufficient to recover its initial contribution. Although DFA asserts that AFLP has always had exclusive responsibility for the day-to-day operations of the plant and the sale and marketing of the products from the plant, including the sale of milk to schools, the initial agreement provided for the business and affairs of the company to be managed by the "Common Members," *i.e.*, by DFA and AFLP.

On July 14, 2004, six days before DFA filed a motion for summary judgment in this case, DFA and AFLP agreed that DFA would exchange its common member interests in Southern Belle for non-voting preferred capital interests, thus eliminating DFA's right to vote on any matter or to sit on the Southern Belle Representative Committee. Pursuant to this revised agreement, AFLP no longer has a "put option," and can sell Southern Belle at its option at any time, and require DFA's interests to be sold. Southern Belle, including its plant in Somerset, is managed by AFLP, which, as noted, is managed by Allen. DFA does not have any ownership interest in AFLP, and AFLP does not have any ownership interest in DFA. With respect to day-to-day responsibilities, Southern Belle's school milk bidding and pricing decisions are made at levels below Allen.

### 3.          *National Dairy Holding and Flav-O-Rich*

National Dairy Holding, L.P. ("National Dairy"), owns the Flav-O-Rich milk processing plant in London, Kentucky, which bids for school milk contracts in many of the same school districts as Southern Belle. National Dairy was formed in March 2001 by Tracy Noll ("Noll"), Allen Meyer ("Meyer"), Cletes Beshears ("Beshears"), the Cletes Beshears Family Trust ("Beshears Family Trust"), and DFA. In February 2004, Noll, Beshears, and Beshears Family Trust sold their interest in National Dairy. Consequently, Meyer now holds fifty percent of the voting interest in National Dairy, and DFA holds the other fifty percent. Meyer and DFA have participated in three other joint ventures, one of which enabled Meyer to turn an investment of several hundred thousand dollars into a gain of approximately seventy million dollars.

As a limited partnership, National Dairy has a general partner responsible for its operations and limited partners. The general partner is Dairy Management L.L.C., which, like National Dairy itself, is fifty percent owned by Meyer and fifty percent owned by DFA. Meyer is also the manager of Dairy Management. National Dairy is operated and controlled solely by its manager. While DFA owns fifty percent of the voting interest in National Dairy, which in turn owns Flav-O-Rich, DFA does not participate in any of Flav-O-Rich's school milk business decisions. Indeed, even National Dairy has limited involvement in the day-to-day operations of Flav-O-Rich, and no involvement in the school milk bidding process or knowledge about the schools to which Flav-O-Rich submits bids, the prices of the bids, or the product mix offered.

### C.          **Evidence Relating to the Structure of School Milk Markets**

The government retained three expert witnesses in conjunction with this case, each of whom prepared a written report. Frank Scott ("Professor Scott") is the Gatton Professor of Economics at the University of Kentucky. John P. Johnson ("Johnson") is a former president of Johnson's Dairy, Inc., in Ashland, Kentucky, with over twenty years of experience in the Kentucky dairy industry. Edward B. Rock ("Professor Rock") is the Saul A. Fox Distinguished Professor of Business Law at the University of Pennsylvania Law School.

According to the expert reports of Johnson and Professor Scott, the school districts at issue in this case purchase milk in half-pint cartons through a sealed bid process and award one-year contracts to the lowest bidder. There is a separate competition and bidding process in each school district. Southern Belle and Flav-O-Rich are the only bidders in forty-two school districts, and two of only three bidders in forty-nine additional districts.

Professor Scott found that the school districts have no practical alternatives to purchasing milk from these suppliers, and would continue to buy milk even if there were a fairly large price increase.

### D. Evidence of Anticompetitive Effects of DFA's Partial Acquisition of Southern Belle

The government's experts offered testimony and submitted reports regarding alleged anticompetitive effects of DFA's partial acquisition of Southern Belle. Professor Scott's report of March 2004 asserts that it is in DFA's interest to reduce or eliminate competition between Flav-O-Rich and Southern Belle, because DFA receives fifty percent of the profits from both dairies, regardless of which supplies a particular school district; in other words, it would not benefit DFA for the two dairies to compete and drive down prices and profits.

In a deposition in June 2004, Professor Rock testified that Meyer and Allen have a strong incentive to manage Flav-O-Rich and Southern Belle in a manner that furthers DFA's interest in suppressing competition, because DFA, National Dairy and Southern Belle all profit from the elimination of competition between the dairies, and because Allen and Meyer have both profited from lucrative joint ventures with DFA in the past, creating "an incredibly strong incentive" for them to "keep DFA happy." J.A. at 1035, 1044. Rock wrote in his March 2004 report that

> [b]y installing joint venture partners who have proved their loyalty, who have economic incentives to achieve the high price outcome and to further DFA's interests, and who have an expectation of future profitable joint ventures with DFA, DFA has made it extremely unlikely that that any competition will break out among its group of dairies. The rational desire of the joint venture partners to participate in highly profitable business opportunities with DFA ensures that they will act in ways consistent with DFA's interests.

J.A. at 934.

Professor Scott asserted in his report that DFA's arrangements were likely to lead to decreased competition comparable to that which resulted from the Southern Belle/Flav-O-Rich bid-rigging conspiracy of the 1970s and '80s. In a rebuttal report responding to an expert report submitted by DFA, Scott also presented an analysis of school bidding data that he concluded was consistent with significant anticompetitive effects. According to his econometric model, before DFA's acquisition of Southern Belle, prices in districts where Southern Belle and Flav-O-Rich were the only bidders on school milk contracts were not significantly different from prices in other districts with only two bidders. Afterwards, districts receiving bids only from Southern Belle and Flav-O-Rich paid more than other districts with only two bidders. "Prices in school districts where only Southern Belle and Flav-O-Rich bid were almost .9 cents higher in 2002 after the transaction than in other districts and in other years." J.A. at 1148.

Scott also testified as the government's representative in a deposition pursuant to Federal Rule of Civil Procedure 30(b)(6). In that deposition, he testified that the government could not identify any "specific instances where a specific price in a specific school district can be linked to an explicit action by DFA," and that the government had no evidence of any specific price increases of milk sold to schools. J.A. at 1791. He also stated that there was no evidence that Flav-O-Rich representatives had communicated with Southern Belle representatives regarding the pricing of bids for school milk contracts, or in which school districts to place bids.

## II.      Procedural History

The government filed a complaint against Defendants on April 24, 2003, alleging that DFA's acquisition of a partial interest in Southern Belle constituted a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. According to the complaint, because of DFA's existing interest in Flav-O-Rich, DFA's partial acquisition of Southern Belle was likely to have the effect of substantially lessening competition for the manufacture, distribution, and sale of school milk and of increasing the prices of school milk in the relevant geographic markets. The government sought the following relief: 1) that DFA be compelled to divest all of its interests in Southern Bell; 2) that DFA be permanently enjoined and restrained from acquiring or maintaining simultaneous legal or beneficial interests in both Southern Belle and Flav-O-Rich; 3) that DFA be compelled to provide the United States with notification at least thirty days in advance of any acquisition of legal or beneficial interests in any fluid milk processing operation; 4) that any school district that entered into a contract with DFA for the supply of school milk be permitted to terminate or rescind such contract; 5) that the government's costs be awarded; 6) that any other further relief as is proper be awarded. Extensive discovery followed the filing of the complaint.

On July 20, 2004, Defendants filed separate motions for summary judgment. DFA also submitted a document modifying the agreement governing the relationship between DFA and Southern Belle. One week later, the government filed a motion in opposition to the motions for summary judgment, and requesting discovery related to the modifications of the DFA-Southern Belle agreement, under Rule 56(f) of the Federal Rules of Civil Procedure.

In the weeks that followed, the parties filed a number of pretrial motions. Without ruling on these and other motions, the district court granted summary judgment to DFA on August 31, 2004. In granting summary judgment to DFA, the district court repeatedly emphasized that DFA had no voting interests in Southern Belle (although the district court failed to note that this was true only as of July 14, 2004), and thus did not have the ability to influence business decisions regarding the sale of school milk. The district court concluded that "[b]ased on the limited nature of DFA's ownership interest in Southern Belle . . . the incentives and opportunities for collusion are not substantially greater by virtue of DFA's dual ownership interests than they were prior to this challenged acquisition," and further, that the government had established no causal connection between DFA's partial acquisition of Southern Belle and any anticompetitive effects on the market for school milk.

With respect to Southern Belle, the district court concluded that Section 7 of the Clayton Act operates only against the acquirer in a transaction, and thus, that Southern Belle could not be liable as a matter of law.

The government filed a notice of appeal to this Court on October 28, 2004.

## DISCUSSION

## I.      The Grant of Summary Judgment to Defendant Southern Belle

We will briefly address the government's case against Southern Belle before turning to the heart of this dispute. The district court granted Southern Belle's motion for summary judgment on the ground that Section 7 of the Clayton Act is directed solely against the acquirer in a transaction, in this case, DFA. *See* 15 U.S.C. § 18 ("No person . . . *shall acquire . . .*") (emphasis added); *Dailey v. Quality School Plan, Inc.* 380 F.2d 484, 488 (5th Cir. 1967) ("§ 7 by its terms proscribes only the acquiring corporation").

The government argued in the alternative that Southern Belle's presence in the case was required for complete relief. The district court rejected this contention because it found that DFA

was also entitled to summary judgment on all claims. Although we disagree with this conclusion, for reasons that will be explained below, we will not consider the government's alternative argument with respect to Southern Belle because it was waived.

The only argument against the grant of summary judgment to Southern Belle in the government's brief is contained in a footnote on page thirty-seven, stating that the grant of summary judgment in favor of Southern Belle must be reversed if this Court reverses the judgment in favor of DFA, because non-acquiring parties may be joined in a Section 7 case if they are necessary for relief. An argument contained only in a footnote does not preserve an issue for our review. Rather, an appellant's brief must include a statement of the issues presented for our review, and an argument with respect to each issue. FED. R. APP. P. 28(a); *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 43 F.3d 1054, 1058-1059 (6th Cir.1995) (an issue only "drop[ped]" in a footnote and not raised in the statement of issues or argument section of a brief is not properly raised before the Court); *see also Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 462 (6th Cir. 2003) (issue waived when mentioned only in the final sentence of a brief). Furthermore, the government's attempt to save the issue by inclusion in its reply brief is unavailing. *See United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir.1993). The government has not preserved, and we will not entertain, any argument with respect to the grant of summary judgment to Southern Belle.

## II.     The Original Agreement

### A.     Standard of Review

This court reviews *de novo* a district court's grant of summary judgment, applying the same legal standard as the court below. *Equitable Life Assur. Soc'y of the United States v. Poe*, 143 F.3d 1013, 1015 (6th Cir. 1998). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (c). We must consider the factual evidence and draw all reasonable inferences in favor of the non-moving party. *Verizon North Inc. v. Strand*, 367 F.3d 577, 581 (6th Cir. 2004). A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party. A "mere scintilla" of evidence will not be enough for the non-moving party to withstand summary judgment. *Skousen v. Brighton High School*, 305 F.3d 520, 526 (6th Cir. 2002).

### B.     The District Court's Failure to Consider the Government's Claim Regarding the Original Agreement

A threshold question with respect to this issue is whether the district court was required to rule on the legality of the original Southern Belle agreement. The district court did not so rule, and did not offer any explanation of its failure to do so. DFA argues that because the original agreement was replaced by a revised agreement, the district court did not need to examine the legality of the original agreement. According to DFA, no relief could have been afforded even if the original agreement was illegal, because the government did not seek money damages and, in the absence of any evidence that DFA intends to reinstate the terms of the original agreement, an injunction to prohibit such reinstatement is unnecessary.

This argument is unsuccessful because it misstates the burden in establishing that a claim is moot. The Supreme Court has repeatedly explained that "'[a] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice,'" unless "'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S.

283, 289 (1983) and *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203 (1968)). The party asserting mootness bears a "'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to stand up again." *Id.* Otherwise, "the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" *Id.* (quoting *Mesquite,* 455 U.S. at 289 n.10).

Thus, it is DFA's burden to show that the government's claim with respect to the original agreement is moot; the government is not required, as DFA suggests, to present evidence that the terms of the original agreement might be resorted to. As the government notes, DFA has made no effort to meet its "heavy burden" of persuading the court that it will not revert to the original agreement. The government's claim with respect to the original agreement was not mooted by the adoption of the revised agreement, and the district court should have considered it.

## C.      Section 7 of the Clayton Act

In relevant part, Section 7 of the Clayton Act states:

> No person engaged in commerce or in any activity affecting
> commerce shall acquire, directly or indirectly, the whole or any part
> of the stock or other share capital . . . of another person engaged also
> in commerce or in any activity affecting commerce, where in any line
> of commerce or in any activity affecting commerce in any section of
> the country, the effect of such acquisition may be substantially to
> lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18

Section 7 is "designed to arrest in its incipiency ... the substantial lessening of competition from the acquisition by one corporation of the whole or any part of the stock" or assets of a competing corporation. *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 589 (1957). The Supreme Court has explained that "Congress used the words '*may* be substantially to lessen competition' (emphasis supplied), to indicate that its concern was with probabilities, not certainties." *Brown Shoe Co. v. United States,* 370 U.S. 294, 323 (1962). The government can satisfy its burden by establishing a "reasonable probability" of substantial anticompetitive effects. *Du Pont*, 353 U.S. at 589. Section 7 "can deal only with probabilities, not with certainties. And there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play. If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967) (citations omitted). However, "ephemeral possibilities" will not satisfy the requirement of a reasonable probability. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 623 (1974).

In perhaps the seminal case on Section 7, the Supreme Court explained that where an acquisition would "produce[] a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market," the likelihood that competition will be substantially lessened is so great "that it must be enjoined in the absence of evidence clearly showing that the [acquisition] is not likely to have such anticompetitive effects." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963). Thus, where the government shows that the acquisition in question would result in a firm controlling an undue percentage of the relevant market and a significant increase in the concentration of firms in that market, a presumption of illegality arises because there is a presumption of anticompetitive effects.

The district court explained that the ability to exercise some control over the business decisions of the entity being acquired is critical because the acquisition must *cause* anticompetitive

effects. If the acquiring company has no control over the decision-making that would form the basis of the alleged anticompetitive effects, the district court reasoned, the likelihood of causing anticompetitive effects decreases. J.A. at 84.

The district court's conclusion that a Section 7 plaintiff must demonstrate some mechanism by which the challenged acquisition causes anticompetitive effects is supported by a number of cases, cited by the district court, in which an acquisition was deemed illegal because it gave the acquiring party the ability to influence competitive behavior. These cases focus on the degree to which the defendant controls the decision-making processes that cause anticompetitive effects, rather than the nature or extent of the acquisition. *See du Pont*, 353 U.S. 586 (Section 7 violated when du Pont, which had the same Chairman of the Board as General Motors, acquired a twenty-three percent interest in General Motors); *McTamney v. Stolt Tankers & Terminals, S.A.*, 678 F. Supp. 118 (E.D. Pa. 1987) (where plaintiffs alleged that defendants controlled the business activities of two companies, defendants' motion for judgment on the pleadings failed even though the acquisition was never consummated); *Nelson v. Pacific Southwest Airlines*, 399 F. Supp. 1025, 1029 (S.D. Cal. 1975) (an agreement by which a defendant "achieved significant control over the decision making process or the property of [its competitor] could satisfy the Section 7 acquisition requirement even where defendant had not actually acquired the competitor's stock"). We would also point out that several of the leading Supreme Court cases finding violations of Section 7 were cases in which the defendant was involved in an actual merger, which necessarily implies control and the ability to affect competition. *See Brown Shoe Co.*, 370 U.S. 294; *Procter & Gamble*, 386 U.S. 568*; Philadelphia Nat'l Bank*, 374 U.S. at 321.

This Court therefore agrees with the district court's conclusion that control or influence may cause anticompetitive effects, and that the courts may assume anticompetitive effects with certain strong indications of control.

We, however, do not agree with the district court's conclusion that a lack of control or influence precludes a Section 7 violation. The Supreme Court's 1961 decision in *du Pont* is instructive on this point. In its 1957 *du Pont* decision, the Court found that du Pont's twenty-three percent ownership of General Motors common stock violated Section 7, in that du Pont purposely purchased the stock so that it would "entrench itself as the primary supplier of General Motors' requirements for automotive finishes and fabrics." 353 U.S. at 606. Although the Court found an antitrust violation, it left to the district court the task of fashioning an appropriate remedy. *Id.* at 607.

The district court approved a remedy whereby du Pont would retain ownership of the General Motors stock, but the stock would be stripped of its voting rights. *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 321 (1961). These voting rights would be distributed *pro rata* to du Pont shareholders. *Id.* at 320. In addition, the remedy prevented du Pont officers or directors from serving as General Motors officers or directors. *Id.* at 321.

The Supreme Court found the district court's remedy to be inadequate to address the antitrust violation.[1] The Court initially emphasized that in cases where the United States has shown a Section 7 violation, divestiture, as opposed to voting restrictions, is a "natural remedy." *Id.* at 229.

---

[1] This Court recognizes that the 1961 *du Pont* decision was essentially a remedy case, and that the burden differs in such a case. 366 U.S. at 334 ("For it is well settled that once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor."). In this case, the government has not proved an antitrust violation. This Court relies on *du Pont* only insofar as it demonstrates the possibility of an antitrust violation without control or influence.

The Court further explained that divestiture of only voting rights was insufficient to eliminate the harm created by the violation of Section 7. Specifically, the Court reasoned that du Pont's shareholders, the group now vested with significant voting power in the affairs of General Motors, would gain if du Pont continued its anticompetitive relationship with General Motors. *Id.* at 331. In other words, even though du Pont "the corporation" no longer had voting control, the group who did have such control had the same interests as du Pont, thus preserving the concern about the lessening of competition. *Id.* at 331-32.

Moreover, the Court found that the mere fact that du Pont maintained ownership of a significant portion of albeit non-voting stock could be enough to deter du Pont's competitors from seeking business with General Motors. *Id.* at 332.

The Court also found that even without voting control, General Motors may have become accustomed to the "special relationship" with du Pont, such that General Motors would "act accordingly." *Id.*

In addition, du Pont's ability to sell the stock, and thus reunite the ownership right with the voting right, could "conceivably" be used as leverage against General Motors.[2] *Id.*

In sum, even without control or influence, an acquisition may still lessen competition. As the Supreme Court stated, "A company need not acquire control of another company in order to violate the Clayton Act. Section 7 prescribes acquisition of 'any part' of a company's stock where the *effect* 'may be substantially to lessen competition, or tend to create a monopoly.'" *Denver and Rio Grande W. R.R. Co. v. United States*, 387 U.S. 485, 501 (1967) (quoting 15 U.S.C. § 18) (citations omitted) (emphasis supplied). The key inquiry is the effect on competition, regardless of the cause.[3]

### D.     The Government Presented Sufficient Evidence to Survive Summary Judgment on its Claim Regarding the Original Agreement

In finding that the government had not established a reasonable probability that DFA's partial acquisition of Southern Belle, as structured under the *revised* agreement, would have anticompetitive effects, the district court emphasized that DFA had no voting interest in Southern Belle and no control over Southern Belle's business decisions. However, this was not the case under the original agreement. Pursuant to the original agreement, "the business and affairs of [Southern Belle] shall be managed by the Common Members [DFA and AFLP] . . . who shall be represented by and act through the Representative Committee." J.A. at 466. Each Common Member was to

---

[2] This rationale, unlike the previous three, went to du Pont's ability to control or influence General Motors.

[3] The district court cited two cases for the proposition that a lack of control or influence necessarily precludes a Section 7 violation. *United States v. Int'l Harvester Co.* is a case that deals not with control, but with competitive effect. There, a manufacturer of tractors purchased a large percentage of stock in an ailing manufacturer of tractors. 564 F.2d 769, 776 (7th Cir. 1977). The court found that because of the cash infusion that resulted from the stock purchase, the ailing manufacturer substantially improved its competitive position. *Id.* at 777. While it is true that the purchasing manufacturer did not have control over the ailing manufacturer, the court found that the purchase was not a Section 7 violation because "[c]ompetition in the . . . tractor market ha[d] been strengthened" as a result of the stock purchase. *Id.* at 778.

The other case cited by the district court is a California district court case, *United States v. Tracinda Inv. Corp.*, 477 F. Supp. 1093 (C.D. Cal. 1979). That too was a case that dealt with the effect on competition: there, the district court found that there could be no anticompetitive effect from the defendant's purchase of a competitor's stock, as the market was still competitive, with many firms and low barriers to entry. *Id.* at 1108.

We concede, however, that the California district court held that a lack of control over an acquiree corporation placed such acquisition in the "solely for investment" exception of the Clayton Act. *Id.* at 1102. Insofar as that decision stands for the proposition that control is a necessary requirement for a Section 7 violation, we disagree.

appoint two representatives to serve on the Representative Committee, and "[e]ach such individual shall either be the Common Member himself or herself or shall be a director, officer, employee, general partner, or limited partner of the Common Member that appointed him or her." J.A. at 467. Thus, it appears that, at the very least, an indirect role for DFA in the business of Southern Belle was contemplated by the agreement.[4]

In addition, pursuant to the original Southern Belle agreement, DFA had a fifty percent voting interest in Southern Belle because of its position as a Common Member with half of the representatives on the Representative Committee. Hanman testified that matters such as Allen's bonus and salary were determined by the Representative Committee. In addition, § 3.2 of the original agreement invests the sole power for decisions regarding the procurement of raw milk in DFA, and requires the approval of the Representative Committee for any actions or expenditures requiring in excess of $150,000.

In summary, DFA already had a fifty percent voting interest in National Dairy, and hence in the Flav-O-Rich milk processing plant, when it entered into the original Southern Belle agreement. Pursuant to that agreement, DFA acquired a fifty percent voting interest in Southern Belle and in its milk processing plant. Thus, DFA had a fifty percent voting interest in the only milk processing plants operating in over forty school districts in Kentucky and Tennessee. Furthermore, DFA had the power to help set the salary of those running the Southern Belle plant and to veto certain expenditures. This demonstrates that DFA's acquisition of Southern Belle included a mechanism by which DFA exercised some control over the business activities of Southern Belle, and resulted in its controlling an undue percentage of the relevant market as well as a significant increase in the concentration of firms in that market. Here, DFA's control was sufficient to show that the acquisition caused anticompetitive effects. Thus, a presumption of illegality in the acquisition was established, the government raised a genuine issue of material fact regarding whether DFA's acquisition of Southern Belle was in violation of Section 7 of the Clayton Act, and summary judgment should not have been granted with respect to the government's claim regarding the original agreement.

## III.    The Revised Agreement

### A.    Standard of Review

The standard of review and the principles of law related to Section 7 laid out in Part II of this opinion are equally applicable in this Part.

### B.    The Government Presented Sufficient Evidence to Survive Summary Judgment on its Claim Regarding the Revised Agreement

The district court granted summary judgment against the government with respect to the revised agreement, because it found that DFA did not have any control over Southern Belle, let alone control over Southern Belle's day-to-day operations, including its bidding and pricing decisions.

---

[4]DFA asserts in its brief, without clear support, that "AFLP *always* has had exclusive responsibility for the day to day operations of the plant and the sale and marketing of the products from the plant, including the sale of milk to schools." Def. Brief at 9. While DFA may have evidence to establish that this was true in practical terms, they do not cite to it here; furthermore, evidence of how control within Southern Belle was exercised in actuality would not negate the fact that its operating structure appears to cede at least some control to DFA. Thus, DFA's argument ignores the Supreme Court's admonition that in Section 7 cases, courts deal with "probabilities, not with certainties," and there is "no requirement that the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play." *FTC v. Procter & Gamble Co.*, 386 U.S. at 577.

As explained *supra*, the district court erred in its focus on control, as opposed to the effect on competition; because control was not present in DFA's relationship with Southern Belle, the district court reasoned that the effect of a lessening of competition was also not present. This logic ignores the possibility that there may be a mechanism that causes anticompetitive behavior other than control.

For example, in *du Pont*, the Supreme Court found that even though du Pont did not have control or influence over General Motors because it no longer had voting rights, anticompetitive effects could still occur, because a group with similar interests as du Pont--its shareholders--held the voting rights. *See supra*. Likewise, in this case, DFA purportedly cured any potential antitrust problems in the agreement with Southern Belle by giving all of its voting rights to AFLP. This cure, however, ignores the fact that AFLP and DFA have closely aligned interests to maximize profits via anticompetitive behavior. As Professor Scott explained, "[t]o think that the nature of the interaction between the two dairies will not change is naive, because that would be contrary to the economic incentive of all parties." J.A. at 1202.

Even under its own inquiry, the district court erred in its decision because the government presented evidence that DFA did in fact have control or influence over Southern Belle. While DFA does not have a voting interest under the revised agreement, it may leverage its position as Southern Belle's financier to control or influence Southern Belle's decisions. Although Southern Belle may seek alternative financing, the United States correctly points out that such a switch may be a negative signal to other potential lenders. Pl.'s Br. 33. In other words, Southern Belle may be "locked in" to a relationship with DFA, a fact that DFA could use to its advantage. As a result, DFA's financial relationship with Southern Belle could lead to anticompetitive effects.

In short, a genuine issue of material fact exists as to whether there is a reasonable probability that the revised agreement would substantially lessen competition, through DFA's control or otherwise. The district court therefore erred in granting summary judgment in favor of DFA with respect to the revised agreement.

## IV.     The Government's Discovery Claim

### A.     Standard of Review

Rulings concerning the scope of discovery are generally reviewed for abuse of discretion. *Criss v. City of Kent*, 867 F.2d 259, 261 (6th Cir.1988). "A district court does not abuse its discretion in denying discovery when the discovery requested would be irrelevant to the underlying issue to be decided." *Green v. Nevers*, 196 F.3d 627, 632 (6th Cir. 1999).

### B.     Analysis

The government contends that the district court's failure to allow the government discovery on the revised agreement, pursuant to Rule 56(f), warrants reversal. Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

FED. RULE CIV. P. 56(f)

The government cited Rule 56(f) in its memorandum in opposition to DFA's motion for summary judgment. As an initial matter, we note that the government does not even address the fact that it failed to comply with the requirements of Rule 56(f) when it invoked the rule to request discovery on the revised agreement. Rule 56(f) notes that it must "appear from the affidavits of a party opposing the motion" that the opposing party cannot present essential facts and that summary judgment should not yet be granted. FED. RULE CIV. P. 56(f). However, the government cited to no such affidavits in moving for further discovery and a denial of summary judgment under Rule 56(f).

Moreover, the government failed to comply with this Court's instruction that a party opposing a summary judgment motion on Rule 56(f) grounds must indicate to the district court "'what material facts it hopes to uncover.'" *Gettings v. Building Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300, 305 (6th Cir. 2003) (quoting *Cacevic v. City of Hazel Park,* 226 F.3d 483, 488 (6th Cir.2000)). The government similarly fails to do so in its very cursory discussion of this issue before this Court. Given that the government did not satisfy at least two of the requirements of Rule 56(f), we conclude that the district court did not abuse its discretion in denying the government's motion under Rule 56(f).

## CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's implicit grant of summary judgment to DFA on the government's claim regarding the original agreement between DFA and Southern Belle, we **REVERSE** the district court's grant of summary judgment to DFA with respect to the government's claim regarding the revised agreement, and we **REMAND** to the district court for trial. We **AFFIRM** the district court's implicit denial of the government's request for further discovery under Rule 56(f) of the Federal Rules of Civil Procedure.