**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0876n.06
Filed: December 20, 2007

**No. 07-3156**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

RAMAN TALWAR,

     **Plaintiff-Appellant,**

v.

CATHOLIC HEALTHCARE PARTNERS; ST. RITA'S MEDICAL EXECUTIVE COMMITTEE; HERBERT SCHUMM; DAVID IMLER; ST. RITA'S MEDICAL CENTER,

     **Defendants-Appellees.**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

_____/

**BEFORE:**    MERRITT and CLAY, Circuit Judges; and COX, District Judge.[*]

     **CLAY, Circuit Judge**. Plaintiff, Dr. Raman Talwar, appeals from an order granting summary judgment on Plaintiff's claims of racial discrimination under 42 U.S.C. § 1981 and breach of contract in favor of Defendants Catholic Healthcare Partners, St. Rita's Medical Executive Committee, Herbert Schumm, David Imler and St. Rita's Medical Center. Plaintiff also appeals the district court's denial of his motion to compel discovery and its finding that Defendants were entitled

_____

[*]The Honorable Sean F. Cox, United States District Court for the Eastern District of Michigan, sitting by designation.

to peer review immunity pursuant to Ohio Revised Code § 2305.251. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## BACKGROUND

Plaintiff, Raman Talwar ("Dr. Talwar"), was born in India and immigrated to the United States in 1980. Dr. Talwar later became licensed as a physician and established a medical practice in Lima, Ohio. In 1991, Dr. Talwar was granted medical staff privileges at St. Rita's Medical Center ("St. Rita's") where he practices general and vascular surgery. Dr. Talwar's appointment to the medical staff was made pursuant to the Medical Staff Bylaws ("Bylaws") and the Medical Staff Credentials Manual ("Credentials Manual") of the hospital.

The Surgical and Invasive Procedure Review Committee ("SIPR") of St. Rita's is a committee that reviews medical cases for quality assurance pursuant to St. Rita's Bylaws. In September of 2003, SIPR conducted a quality of care review of one of Dr. Talwar's vascular surgery cases. At the conclusion of the review, SIPR concluded that Dr. Talwar's case raised quality of care concerns and forwarded its findings to the St. Rita's Medical Executive Committee ("MEC") for further action. Pursuant to the Bylaws, MEC is responsible for the evaluation of the clinical competency of medical staff at St. Rita's and may request investigations of medical staff.

On September 23, 2003, MEC informed Dr. Talwar of SIPR's findings and asked him to respond to the quality of care concerns in writing. After reviewing the case and Dr. Talwar's written response, MEC hired the Greeley Company, a third-party review organization, to conduct a partial review of Dr. Talwar's practice. The Greeley Company found quality of care concerns with Dr. Talwar's practice in eleven of the nineteen cases reviewed.

In April of 2004, after reviewing the findings of the Greeley Company, and pursuant to the Bylaws and Credentials Manual, MEC initiated a formal investigation. Dr. Talwar was advised of the investigation and the Greeley findings by MEC members Dr. Herbert Schumm and Dr. David Imler. Dr. Schumm and Dr. Imler requested that Dr. Talwar refrain from exercising his surgical privileges during the pendency of the investigation. Dr. Talwar was also permitted to present an expert report for the investigative committee's consideration.

After considering the interview with Dr. Talwar, the Greeley report as well as the report of Dr. Talwar's expert, the investigative committee determined that there was insufficient evidence to substantiate the quality of care concerns raised by SIPR and recommended that the investigation be terminated. The committee also recommended that MEC restore Dr. Talwar's surgical privileges.

Following the conclusion of the investigation, Dr. Talwar brought suit against St. Rita's, Dr. Schumm, Dr. Imler and Catholic Healthcare Partners for a number of claims, including racial discrimination under 42 U.S.C. § 1981 and breach of contract. *Talwar v. Catholic Healthcare Partners*, 2006 WL 3526792 (N.D. Ohio 2006). During the course of discovery, Plaintiff filed a motion to compel discovery of documentation related to MEC deliberations leading up to the request for an external review of his cases as well as the investigatory committee's final report. The district court denied Plaintiff's motion to compel discovery.

Defendants later moved for summary judgment, asserting that Plaintiff failed to present sufficient evidence to support his claims. Moreover, Defendants argued that even if Plaintiff established liability, they were protected under Ohio's peer review immunity statute. The district court granted summary judgment in favor of Defendants on all claims. Plaintiff now timely appeals.

## DISCUSSION

### *Standard of Review*

This Court reviews a district court's grant of summary judgment *de novo*. *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1176 (6th Cir. 1996). Summary judgment is appropriate if, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As the moving parties, Defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element on each of Plaintiff's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Plaintiff, as the non-moving party, must then present sufficient evidence from which a jury could reasonably find for him. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). This Court must then determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In making this determination, this Court must draw all reasonable inferences in favor of Plaintiff. *See National Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997).

## I. SECTION 1981 CLAIM OF RACIAL DISCRIMINATION

Enacted as part of the Civil Rights Act of 1866, 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts" without regard to race. 42 U.S.C. § 1981. The statute defines the phrase "make and enforce contracts" to include the "making, performance, modification, and

termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Before the district court, Plaintiff alleged that he was discriminated against "with respect [to] the terms, conditions, and privileges of his contract with defendant because of color." (J.A. at 14)

### 1. Contractual Relationship Between the Parties

"Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). Defendants argue that Plaintiff may not prevail in his § 1981 claim because he has not established the existence of a contractual right that was allegedly blocked or impaired by racial discrimination. Although Plaintiff acknowledges that he does not have a formal employment contract with the hospital, he submits that the hospital's Bylaws and Credentials Manual constitute contracts. Both parties agree that Ohio law controls for the purpose of determining whether a contract exists. Applying Ohio law, the district court concluded that Plaintiff did not present sufficient evidence from which a jury could find that a contract existed between the parties.

Under Ohio law, staff bylaws may constitute a contract where "there can be found in the bylaws an intent to be bound." *Munoz v. Flower Hosp.*, 507 N.E.2d 360, 365 (Ohio Ct. App. 1985). Accordingly, we examine the language of the Bylaws and Credentials Manual to determine whether the parties evinced an intent to be bound. *See Bouquett v. St. Elizabeth Corp.*, 43 Ohio St. 3d 50,

5

52 (Ohio 1989) ("[B]efore we can determine if appellant medical center is bound by the staff bylaws, we must consider the language of the bylaws at issue.").

The Credentials Manual provides that the Manual may be revised or amended by the hospital's Board of Trustees "on its own initiative" after providing notice to MEC. (J.A. at 178) In addition, the preamble to the Bylaws state that the procedures promulgated to insure the quality of medical care at the hospital are "subject to the ultimate authority of the hospital's Board of Trustees." (J.A. at 114) In interpreting similar bylaws and guidelines containing conditional language such as "subject to" or "on its own initiative," Ohio courts have found that the presence of such language is evidence of a lack of mutuality between the parties. *See Munoz v. Flower Hosp.*, 507 N.E.2d 360, 365 (Ohio Ct. App. 1985).

For example, in *Munoz v. Flower Hospital*, the Ohio Court of Appeals considered a breach of contract claim alleged by an anesthesiologist after being denied reappointment by the defendant hospital. 507 N.E.2d at 362. The court rejected the plaintiff's contention that the hospital's staff bylaws constituted a contract because they were "subject to the ultimate authority of the applicable governing bodies," including the hospital's board of trustees. *Id.* at 365. The court concluded that "[t]he obvious interpretation of the bylaws' preamble is that the trustees are, and therefore the hospital is, not to be bound by the staff bylaws and that there is no contractual relationship arising from these staff bylaws because there is no mutuality of obligation between the parties." *Id.*; *accord Holt v. Good Samaritan Hosp. and Health Ctr.*, 590 N.E.2d 1318, 1322 (Ohio Ct. App. 1990); *Wilkey v. McCullough-Hyde Memorial Hosp.*, 2007 WL 3047234, at *10 (S.D. Ohio 2007); *Nilavar v. Mercy Healthsystem-Western Ohio*, 494 F.Supp. 2d 604, 622-23 (S.D. Ohio 2005). *But see*

*Rahimi v. St. Elizabeth Med. Ctr., Inc.*, 1997 WL 33426269, at \*6 (S.D. Ohio 1997) (unpublished) (finding staff bylaws expressed an intent to be bound where the hospital board of trustees vested a right in the medical staff to disciplinary hearing and appeal procedure, which placed an obligation on the board of trustees); *Awadalla v. Robinson Mem'l Hosp.,* 1992 WL 188333, at \*3 (Ohio Ct. App. 1992) (unpublished) (finding staff bylaws could constitute a contract where the chairman of the board of trustees testified "that the board never relayed to the medical staff an intention not to be bound by the bylaws"). Based upon the similarity of the language contained in the Bylaws and Credentials Manual and the language at issue in *Munoz*, it would seem that no contractual relationship existed between the parties.

Courts applying Ohio law, however, have also examined extrinsic evidence to determine whether a hospital intended to be bound. *See Nilavar*, 494 F.Supp. 2d at 622-23 (analyzing evidence of negotiations between hospital and plaintiff in determining whether staff bylaws constituted a contract under Ohio law). Plaintiff in the instant case offers a letter of reappointment dated December 3, 2004 as evidence that Defendant intended to be bound. The letter states, in pertinent part, "[t]his reappointment is subject to all terms and conditions of your initial appointment, any previous appointments, the bylaws, rules and regulations, credentials manual and policies and procedures of this hospital and medical staff that are in force during the term of your reappointment." (J.A. at 294)

The letter, however, sheds little light on the intent of the parties to be contractually bound by the procedures set forth in the Bylaws or the Credentials Manual. The letter merely reaffirms that Plaintiff's appointment will be subject to existing guidelines and policies as represented by the

7

Bylaws and Credentials Manual, both past and present. The self-declared purpose of the Bylaws and Credentials Manual is to protect the best interests of patients, regulate activities of the medical staff, and insure the provision of quality medical care for the hospital's patients, not to declare or create contractual rights of individual members of the medical staff. However, even assuming that the Bylaws and Credentials Manual do create a contractual relationship between the parties, we find that Plaintiff has not produced sufficient evidence to sustain his claim of racial discrimination under § 1981.

### 2. Prima Facie Case of Racial Discrimination

"A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). In the instant case, Plaintiff has not offered any direct evidence of racial discrimination. "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999). It does not require the fact finder to draw any inferences to reach that conclusion. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000). We have held that to prevail in a claim of race discrimination under § 1981 based on circumstantial evidence, a plaintiff must meet the tripartite standard of proof for Title VII cases established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

Under *McDonnell Douglas-Burdine*, Plaintiff must establish a prima facie case of racial discrimination. McDonnell Douglas, 411 U.S. at 802. A prima facie case is established where a plaintiff demonstrates that 1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside of the protected class or treated less favorably.[1] *Johnson*, 215 F.3d at 572-73 (citing *McDonnell Douglas*, 411 U.S. at 802). If this prima facie case is met, "[t]he burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions." *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir. 2001).

To ultimately prevail, Plaintiff must show that Defendants' proffered race neutral explanation "was not its true reason, but a pretext for discrimination." Id. Plaintiff may meet this burden by showing 1) that the reasons given have no factual basis; 2) the stated reasons were not the actual reasons; or 3) that the reasons given were insufficient to justify the defendant's action. *Johnson*, 215 F.3d at 574. While the parties do not dispute the first three elements of the prima facie case, they do dispute, however, whether Plaintiff offered sufficient proof that he was treated less favorably than others outside of his protected class.

Before the district court, Plaintiff asserted that he believed he was the victim of racial discrimination. As proof, Plaintiff submitted an affidavit stating that he had not practiced medicine

---

[1] We have recognized that "[t]here is ample precedent for requiring a distinct formulation of the burden shifting framework in differing factual circumstances." *Christian*, 252 F.3d at 869. Although the relationship between the parties is not the kind of employment relationship to which the *McDonnell Douglas-Burdine* test is traditionally applied, we find that the parameters of this test are sufficiently applicable to this context. *See Benjamin v. Brachman*, 2007 WL 2264513, at *15 (6th Cir. 2007) (unpublished). *But see Jeung v. McKrow*, 264 F.Supp. 2d 557 (E.D. Mich 2003) (applying modified *McDonnell Douglas-Burdine* test in § 1981 claim arising from termination of medical staff privileges).

in a manner warranting investigation. Plaintiff further argued that "the Defendants did with malice and evil intent, wrongfully investigated [sic] Dr. Talwar due to his race and yet did not so treat other similarly situated white doctors." (J.A. at 264) Although Plaintiff points to no other doctor outside of his protected class that was treated differently, he argues that the failure of the hospital to comply with the investigative procedures set forth in the Bylaws and Credentials Manual by initiating two investigations demonstrates that he was treated less favorably than individuals outside of his protected class. We disagree.

We have suggested that the failure to follow internal disciplinary procedures constitutes evidence of discrimination. *See Durante v. Ohio Civil Rights Comm'n*, 1990 WL 68856, at *3 (6th Cir. 1990) (unpublished) ("Evidence of disparate application of disciplinary procedures in the termination decision is merely evidence relevant to the ultimate question of discriminatory discharge."); *Felder v. Nortel Networks Corp.*, 187 F. App'x 586, 595 (6th Cir. 2006) (unpublished) (suggesting that failure to adhere to internal disciplinary procedures may serve as evidence of discrimination). Plaintiff has not, however, established that this process has been applied differently to other non-minority members of the staff, nor has Plaintiff put forward the names of other doctors who were treated more favorably by MEC in other quality of care investigations by being subjected to a single investigation under similar circumstances or evaluated under more lenient standards. Rather, all we have before us on the question of whether Plaintiff was treated less favorably than others outside of his protected class are Plaintiff's conclusory allegations. Such "conclusory and unsupported allegations, rooted in speculation, do not meet the burden" of the prima facie case. *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003).

The district court also correctly concluded that, assuming that Plaintiff can establish a prima facie case of discrimination, Defendants offered a legitimate, race-neutral explanation. Defendants assert that patient safety was the basis for the commencement of an investigation of Plaintiff's practice. According to Defendants, the investigation at issue stemmed from a September 2003 review of one of Plaintiff's surgical cases. In satisfying their burden of production before the district court, Defendants presented evidence of the Greeley report which suggested that Plaintiff's treatment of patients was inappropriate in eleven out of nineteen cases reviewed. Plaintiff has offered no evidence to refute this explanation as pretextual. Instead, Plaintiff merely argues that patient safety is no excuse to contravene established policy. Again, such a conclusory allegation is wholly insufficient and does little to demonstrate that patient safety "was not [Defendants'] true reason, but a pretext for discrimination." *Christian*, 252 F.3d at 868. Therefore, Plaintiff's § 1981 claim must fail as he did not rebut Defendants' race neutral explanation and therefore failed to meet his burden under the *McDonnell Douglas-Burdine* tripartite test.

II.     BREACH OF CONTRACT

Plaintiff alleges that the district court improperly granted summary judgment with respect to his breach of contract claim. Plaintiff asserts that Defendants breached their contract with him in three ways: 1) the commencement of two separate investigations of alleged improprieties; 2) the failure to disclose the initiation of an investigation; and 3) the ordering of a temporary suspension pending the outcome of the investigation. Assuming the existence of a contract, we address each of these contentions in turn.

## 1. Multiple Investigations of Alleged Improprieties

Plaintiff asserts that Defendants breached their contract by constituting two investigative committees rather than the single committee that is authorized in the Credentials Manual. The Credentials Manual provides that the MEC shall act on all requests for an investigation. It also notes that outside consultants may be used by the MEC. The Credentials Manual's investigation procedure provides as follows:

> The Medical Executive Committee shall meet as soon as practical after receiving a request for an investigation. If, in the opinion of the Medical Executive Committee, the request contains sufficient information to warrant an investigation, the Medical Executive Committee shall conduct an investigation, or shall appoint an individual or a committee to conduct the investigation.

(J.A. at 166)

Plaintiff asserts that both the MEC and an appointed committee conducted investigations, in contravention of the provisions of the Credentials Manual. After taking all reasonable inferences in Plaintiff's favor, we find that there is insufficient evidence to support a finding that two investigations took place. The Bylaws provide MEC with broad authority to consider "information" prior to initiating a formal investigation, such as the use of outside consultants to substantiate an allegation of inadequate patient care. Consideration of a quality of care complaint prior to the commencement of a formal investigative committee by seeking additional information, therefore, does not constitute a separate investigation. Moreover, as Defendants point out, even if two investigations took place, the Credentials Manual authorizes MEC to take "any and all other action deemed appropriate under the circumstances" upon the conclusion of an investigation. (J.A. at 168)

12

Therefore, the initiation of two investigations does not by itself constitute a violation of the Bylaws. Thus, we find that Defendants were entitled to summary judgment as a matter of law on Plaintiff's claim of breach of contract as a result of "two investigations."

### 2. Failure to Disclose the Initiation of an Investigation

Plaintiff claims that the Defendants breached their contract through their failure to disclose the initiation of an investigation. The Credentials Manual states "[t]he medical staff *may* be notified that an investigation is being conducted . . . ." (J.A. at 166 (emphasis added)) However, before the report of the investigation is made "the individual shall be informed of the general nature of the allegations giving rise to the investigation requested, and the individual shall be invited to discuss, explain or refute the allegations." (J.A. at 167) Thus, the language of the Credentials Manual is permissive with respect to notification of the initiation of an investigation but mandatory with respect to an individual being notified prior to its conclusion. As the district court correctly noted, "[t]here is no requirement that the individual be informed o[f] the investigation until he is invited to interview with investigators." *Talwar v. Catholic Healthcare Partners*, 2006 WL 3526792, at *4 (N.D. Ohio 2006). Consequently, there was no dispute of a material fact on this point and summary judgment was appropriately granted to Defendants.

### 3. Temporary Suspension

Plaintiff alleges that Defendants breached their contract when two members of MEC, Defendants Schumm and Imler, temporarily suspended his surgical privileges without following the procedure set forth in the Credentials Manual. The relevant provision of the Credentials Manual

provides that any Chief of Staff, Department Chief or CEO may summarily suspend the privileges of medical staff "whenever such action is necessary to prevent harm, immediate injury or damage to the mental or physical safety and well being of any patient, employee or other person . . . ." (J.A. at 168)  The Credentials Manual also requires that the summary suspension "shall not be for more than fourteen days," and that MEC must be notified for review. (*Id.*)  In addition, the impacted staff member must be notified of the suspension.  Plaintiff contends that he was "threatened"and involuntarily ceased his surgical privileges, thus constituting a suspension without the proper procedural safeguards.  Defendants, however, assert that Plaintiff voluntarily relinquished his surgical privileges.

The district court did not address Plaintiff's allegation of an improper suspension of his surgical privileges as a basis for his breach of contract claim.  Nevertheless, because the claim was raised before the district court, we will address it here.  In the case at bar, the resolution of this claim essentially comes down to Plaintiff's word against that of Defendants; however, it is unnecessary for us to decide whether this factual dispute constitutes a material dispute of fact such that it was improper for the court below to grant summary judgment.  Rather, the district court's failure to address this claim at summary judgment is harmless inasmuch as Defendants are insulated from liability on this claim under Ohio's peer review immunity statute, as discussed below.

## III.    PEER REVIEW IMMUNITY

We now consider whether Defendants are insulated from liability with respect to Plaintiff's state law claims under Ohio's peer review immunity statute.  Plaintiff alleges that the district court

erred in finding that Defendants were protected by peer review immunity under Ohio Rev. Code §

2305.251. Ohio's peer review immunity statute provides, in relevant part, that

> [n]o health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of a peer review committee of the health care entity. No individual who is a member of or works for or on behalf of a peer review committee of a health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of the peer review committee.

Ohio Rev. Code § 2305.251(A). Under Ohio law, a "health care entity" includes those entities that

conduct, as part of their regular business, professional credentialing or quality review involving the

competence, professional conduct, or quality of care provided by health care providers. Ohio Rev.

Code § 2305.25(A)(1). A "peer review committee," as used in the statute, includes a committee that

"[c]onducts professional credentialing or quality review activities involving the competence of,

professional conduct of, or quality care provided by health care providers." Ohio Rev. Code §

2305.25(E)(1)(a).

On appeal, Plaintiff does not challenge the fact that Defendant St. Rita is a covered "health

care entity" or that the MEC is a "peer review committee." Nor does Plaintiff contest the fact that

Defendants Schumm and Imler are covered as members of the "peer review committee." Rather,

Plaintiff asserts that the district court erred in its determination that he did not present sufficient

evidence to overcome the immunity provided to Defendants under the statute. We find Plaintiff's

argument to be unavailing.

To overcome the peer review immunity privilege, "the party seeking relief must present clear

and convincing evidence that defendants acted with actual malice." *Wall v. Ohio Permanente Med.*

15

*Group, Inc.*, 119 Ohio App. 3d 654, 666 (Ohio Ct. App. 1997); *Jacobs v. Frank*, 60 Ohio St. 3d 111, 116 (Ohio 1991). "Actual malice in this context requires proof that defendants made statements in connection with the peer review process with knowledge they were false or with reckless disregard for whether they were true or false." *Wall*, 199 Ohio App. 3d at 666.

Plaintiff asserts that Defendants acted with actual malice as a result of statements made by Schumm and Imler during a conversation in which they informed Plaintiff of the ongoing investigation and requested that he voluntarily abstain from exercising his surgical privileges. Specifically, Plaintiff asserts that Defendants acted with actual malice when they informed him that he would be reported to the National Practitioner's Database if he did not voluntarily give up his privileges. Plaintiff asserts that Defendants knew that this statement was false at the time that it was made because such reports can be forwarded only after the imposition of summary suspension proceedings. However, the mere fact that Defendants' statement was inaccurate is insufficient to serve as proof that Defendants were aware of the falsity of the statement at the time it was made. Indeed, "mere inaccuracies in statements and alleged improper motivations by speakers are insufficient to show actual malice." *Wall*, 199 Ohio App. 3d at 666. Because Plaintiff failed to produce evidence regarding Defendants' knowledge or reckless disregard of the falsity of the inaccurate statement, summary judgment was properly granted to Defendants.

## IV. DENIAL OF PLAINTIFF'S MOTION TO COMPEL DISCOVERY

In Plaintiff's last assignment of error, he asserts that the district court abused its discretion by summarily denying his motion to compel discovery regarding the minutes of the MEC meeting where a vote to authorize an investigative committee took place. "[I]t is well established that the

scope of discovery is within the sound discretion of the trial court." *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 571 (6th Cir. 2001) (quoting *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir.1981)). Consequently, we review rulings concerning the scope of discovery for abuse of discretion. *United States v. Dairy Farmers of America, Inc.*, 426 F.3d 850, 862 (6th Cir. 2005).

Plaintiff alleges that the district court abused its discretion by failing to conduct an in camera inspection of the minutes to determine which, if any, of the material was discoverable. Defendants argue that the district court properly declined to conduct an in camera inspection of the MEC minutes at issue because such records are not discoverable under Ohio law. *See* Ohio Rev. Code § 2305.252 ("Proceedings and records within the scope of a peer review committee of a health care entity shall be held in confidence and shall not be subject to discovery or introduction in evidence in any civil action against a health care entity or health care provider . . . ."). Even assuming that the district court improperly denied Plaintiff's motion to compel discovery, such an error would not require reversal by this Court as we find the error, if any, to be harmless. In the case at bar, Plaintiff has not demonstrated how he was ultimately prejudiced by the denial of discovery or whether the availability of the committee's records would have established a disputed material fact. *See Wolotsky v. Huhn*, 960 F.2d 1331, 1338 (6th Cir. 1992) (upholding denial of discovery as nonprejudicial where records to be sought did not address any material element of the plaintiff's claim).

With respect to Plaintiff's § 1981 racial discrimination claim, records regarding MEC's vote to authorize an investigative committee would not have assisted in establishing an element of the prima facie case. The minutes would not have shed light on any contractual right that existed between the parties nor would it have disclosed whether physicians outside of Plaintiff's protected

class were subject to a different procedure under the Bylaws. With respect to Plaintiff's breach of contract claim, as discussed above, even assuming that Plaintiff could prove that the committee conducted two investigations, it would not have established that a breach of contract occurred. Because the minutes recording MEC's vote to authorize an investigative committee would not have assisted Plaintiff in establishing a disputed material fact with respect to either his claim of racial discrimination or breach of contract, any error made by the district court in denying his motion to compel discovery was harmless. We need not, therefore, disturb the judgment of the district court.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.